UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

KELVIN JAMES, JODI FOSTER, AND TERRY
HARDY, on behalf of themselves and all others similarly
situated,

                              Plaintiffs,

        -against-

PENGUIN GROUP (USA) INC. and AUTHOR
SOLUTIONS,

                             Defendants.

------------------------------------------------------------------x

**CLASS ACTION
COMPLAINT**

ECF Case

*JUDGE COTE*

13 CV 2801

RECEIVED
APR 26 2013
U.S.D.C. S.D. N.Y.

## CLASS ACTION COMPLAINT

      Plaintiffs Kelvin James ("James"), Jodi Foster ("Foster"), and Terry Hardy ("Hardy")
(collectively "Plaintiffs") on their own behalf and on behalf of all others similarly situated
("Class"), through their attorney Oren Giskan, Esq. and Giskan, Solotaroff, Anderson & Stewart
LLP, hereby submit this Class Action Complaint against Defendant Penguin Group (USA) Inc.
("Penguin" or "Defendant"), and Author Solutions, a Penguin company ("Author Solutions")
(collectively "Defendants").  For support Plaintiffs state:

## I.      PRELIMINARY STATEMENT

      1.     Plaintiffs James, Foster, and Hardy bring this class action on behalf of themselves
and a Class of similarly situated individuals against Defendants Penguin and Author Solutions,
seeking damages for the proposed Class as defined herein, pursuant to California's Unfair
Competition Law, Business and Professions Code §§ 17200, *et seq.* ("UCL"), 17500, *et seq.*, the
New York General Business Law, N.Y. GBS. LAW § 349 ("NY GBL"), and common law.

      2.     Digital and print-on-demand technology has changed the nature of print

publishing, creating a burgeoning self-publishing industry. Self-publishing has lowered the bar for authors who wish to publish their work but cannot do so through a so-called "traditional publisher," such as Random House or Penguin.

3.      By its own estimation, disseminated through its website, Author Solutions has worked with 160,000 authors and created over 200,000 new book titles.

4.      Author Solutions' revenues are estimated at $100 million per year.  Of the $100 million Author Solutions earns as revenue, approximately one third of that amount, or $33 million annually, comes from book sales.  The rest of its revenue is derived from the services it offers, such as editorial services, formatting and design services, production services, and marketing services ("Services").

5.      Despite its impressive profits from book sales, Author Solutions fails at the most basic task of a publisher: paying its authors their earned royalties and providing its authors with accurate sales statements.

6.      Author Solutions also fails to take diligent care of its authors' works, making numerous and egregious *publisher* errors – errors made by the publisher, not the author.  These errors include errors on book covers, in addition to various typographical and formatting errors. In fact, Author Solutions profits from its own mistakes.  Aggressive sales techniques ensure that these errors are corrected only for a fee of several hundred dollars.  Even though, as a matter of policy, Author Solutions promises to correct publisher errors for free, it rarely does.

7.      Most of Author Solutions' earnings are derived from its publishing and marketing Services.[1]  These Services, which can cost authors tens of thousands of dollars, likewise fail to deliver what they promise: more book sales and more opportunities for authors.

_____

[1]*See, e.g.,* Julie Bosman, *Penguin Acquires Self-Publishing Company*, New
http://mediadecoder.blogs.nytimes.com/2012/07/19/penguin-acquires-self-publishing-company.

8.      Therefore, even while Defendant Author Solutions prominently markets itself on its website as "[t]he leading indie publishing company in the world," authors often discover, once it is too late, that Author Solutions it is not an "indie publisher" at all.  It is a printing service that fails to maintain even the most rudimentary standards of book publishing, profiting not for its authors but from them.

9.      On or about July 19, 2012, Pearson plc, an international media and education company that specializes in consumer publishing markets and owns Penguin, acquired Author Solutions for $116 million.  Author Solutions is operated by Penguin, but its egregious practices have not changed.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), because the matter in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and attorney's fees.

11.     Venue is proper in this District inasmuch as Defendant Penguin maintains its offices and conducts business in this District.

## III.    THE PARTIES

12.     James is a resident of New York, New York.  In or around April 2009, James purchased the "Select" package to commence his publishing relationship with iUniverse for his book *The Sorcerer's Drum.*  James spent approximately $1,000.00 on the package.  The book was published on or about June 18, 2009.  In September 2010, James purchased a second package with iUniverse, the "Premier" package, for his book *Web of Freedom.*  The book was published on or about April 2011.  James terminated his publishing agreement ("Publishing Agreement") with iUniverse on March 21, 2012.

13.     Foster is a resident of Chico, California.   In or around March 2010, Foster purchased the "Premier Pro" package from iUniverse for $1,499.00 for the publication of her book *Forgotten Burial: A Restless Spirit's Plea for Justice.*  In March 2011, Foster purchased the Development Edit service from iUniverse for $4,196.25.   Foster terminated her Publishing Agreement with iUniverse.

14.     Hardy is a resident of Denver, Colorado.     Hardy purchased three publishing packages with AuthorHouse for the publication of his books *The System Safety Skeptic* (November 2010), *Essential Questions in System Safety* (May 2011), and *Software and System Safety* (April 2012).

15.     Defendant Author Solutions is a corporation based in Bloomington, Indiana.  It is owned by Pearson plc and is a member of Penguin and operated by Penguin.  It controls many imprints, including AuthorHouse, iUniverse, and Xlibris and depicts itself as an "indie publisher."

16.     Defendant Penguin is a publishing company, with its headquarters in New York, New York.

## IV.   STATEMENT OF FACTS

17.     In 2011, Author Solutions reports to have sold 27,500 "publishing packages." These packages ("Publishing Packages") initiate the relationship between the author and Author Solutions and often include a bundle of Services.  They range in price from several hundred to several thousands of dollars.

18.     In that same year, Author Solutions estimated that over the course of its relationship with an author, a single author will generate approximately $5,000.00 in revenue, on

average, for the company.[2]

19.     This level of growth does not occur by accident.  It is the result of Author Solutions' aggressive marketing practices that lure authors into purchasing expensive Publishing Packages and other Services.

**Deceptive Marketing Practices**

20.     Author Solutions employs several tactics to lure authors into publishing with one of their imprints.  Author Solutions maintains a dizzying number of its own self-publishing imprints, or trade names, including AuthorHouse, iUniverse, Palibrio, Trafford, and Xlibris.  Each imprint provides essentially the same self-publishing services and even uses the same terminology, such as "Publishing Services Associate" or "Check-In Coordinator," to refer to its employees.  The alleged of practices do not differ across the imprints.

21.     The excessive number of imprints serves a deceitful purpose: it gives authors the impression that they have several self-publishing options when that is not the case.  Many authors, in an effort to avoid republishing a second book with the same imprint, move onto another without realizing that it is simply the same Author Solutions operation under a different name.

22.     Author Solutions has even gone so far as to create fake social media personas to entice authors into self-publishing with them.  For instance, Author Solutions created a fictitious employee named "Jared Silverstone," who identified himself as an "Awesome Publishing Consultant at Author Solutions" on various social media sites, like Facebook and Twitter, and claimed to help authors with their writing and editing.   When this deceitful practice was

---

[2] Jim, Milliot, *Author Solutions Looks for a Buyer,* Publishers Weekly, (Mar. 7, 2012), http://www.publishersweekly.com/pw/by-topic/industry-news/financial-reporting/article/50952-with-sales-of-almost-100-million-author-solutions-looks-for-a-buyer.html.

uncovered, Author Solutions removed "Jared Silverstone" from the media sites, claiming that the fake accounts were not condoned by Author Solutions.

23.     Nonetheless, Author Solutions still maintains a number of websites designed to direct authors to publish with Author Solutions. For instance, chooseyourpublisher.com, poetry-publishers.com, and ebookspublishing.com are designed to resemble independent websites that help authors understand their publishing options. All of these sites lead to the same place: an Author Solutions imprint.

**The Author Experience**

24.     Authors initially communicate with the sales team at one of Author Solutions' imprints. The sales team has a quota for how many Publishing Packages they must sell on a daily basis. Authors experience no difficulty in reaching a representative to discuss questions or concerns at this stage in the process.

25.     The sales team uses aggressive techniques. For instance, the sales team often represents to authors that they will receive 20% in royalties off of the cover price of their book. Several authors purchase Publishing Packages over the telephone and do not realize that this is not the case. Authors receive royalties off of what Author Solutions actually earns.

26.     Once an author has purchased a Publishing Package, the author then may receive a call or an email from what Author Solutions calls a Check-In Coordinator. At other points in the process, an author will communicate with a Production Services Associate ("PSA"), a Marketing Associate/Consultant, or any other number of associates at Author Solutions, who may be based in the United States or in the Philippines. At this point, authors experience difficulty reaching their PSA or Check-In Coordinator at Author Solutions.

27.     Authors also begin to experience significant delays in pushing their manuscript

forward.  While the delay tactic hurts authors and runs contrary to the benefit self-publishing, which Author Solutions repeatedly touts on its website and in sales calls, it benefits Author Solutions.  It allows Author Solutions more time to generate its target of $5,000.00 in revenue over the course of its relationship with an author.  This is why authors receive repeated calls from sales associates, even while authors are unable to reach their editors and push their manuscripts forward.

28.    Check-In coordinators and PSA's are instructed not to correct errors in manuscripts, even the most glaring errors.  While authors are given a chance to correct fifty of their own mistakes without a fee, this often does little to address errors, made either by the publisher or the author, in the final manuscript.

29.    Authors discover that new errors appear in the final version of their work.  When they call to complain, they have difficulty reaching their PSA's and customer support, and when they finally reach a representative, they are told that the errors can only be corrected for a fee.  In other words, Author Solutions profits from its own errors.

**Sales and Royalties Statements**

30.    Authors' Publishing Agreements with respect to royalties are confusing.  Despite what authors are told by the sales team, the Publishing Agreements state, albeit unclearly, that authors are paid royalties off of what the publisher *actually* receives, after Amazon or other distributors have taken a cut.  This usually amounts to approximately $1.00 to $3.00 per book.

31.    Author Solutions' eBooks are typically sold uniformly at $9.99 per book.  An author is entitled to 50% of the royalties from such sales, but authors discover that here, too, they are not properly paid their royalties from eBook sales.

32.    Authors are either never paid according to the terms of their contracts or have no

way of knowing whether they are being paid correctly. Authors who attempt to contact Author Solutions to understand why often have trouble reaching a representative or receiving a consistent response. At different times, an author might be told that there was a glitch or an error, that it is simply not clear what happened, or that the author must provide proof of sales to fix the problem.

33.     An author may receive different sales reports depending on the sales representative with whom they are speaking, different sales reports for the same period, or a check in a different amount from what their sales report, accessible online, has reported.

34.     Some authors are told that they have simply made no sales, even when authors have proof that this is not the case.   In fact, authors whose books become "best sellers" on Amazon.com are still sometimes told that they have no sales. Thus, even authors with proof of sales find that they have no reported sales.

**Services**

35.     As soon as an author purchases a Publishing Package, she begins receiving aggressive sales and marketing calls from Author Solutions. This alone causes some authors to terminate their relationship with Author Solutions.

36.     Prominently on its website, Author Solutions touts that "Hollywood has noticed" in an effort to promote one of its most expensive and most lucrative packages for Author Solutions: the Hollywood package. Author Solutions claims that the Hollywood package helps authors "get their work into the hands of Hollywood entertainment executives who are looking for new ideas for film and television." Instead, this product, which generally costs authors approximately $10,000 or more, provides Author Solutions with an easy way to profit but accomplishes essentially nothing for the author. In 2011 alone, this package brought in $3.5 million in revenue for Author Solutions, but only *two authors* succeeded in getting their titles

optioned for film or television.  Author Solutions does not disclose this fact when selling the Hollywood package to its authors.[3]

37.     Author Solutions also sells numerous editing packages that are priced according to word count and designed to improve content and grammar.  But even after spending thousands of dollars on such a package, authors discover that their final book contains errors that either already had been or should have been corrected.

38.     Author Solutions also aggressively sells marketing packages ostensibly designed to promote book sales.  The package is often designed as a ninety-day campaign, but authors find that weeks into the campaign, Author Solutions has done nothing.  When Author Solutions finally embarks on its campaign, authors receive nothing more than a handful of contacts for a bookstore, or a press kit with typographical errors that market Author Solutions' products more than the author's book, or a five minute television slot on a local television channel with no viewers.

**James Allegations**

39.     James purchased a "Select" package from iUniverse in or around April 2009 for the publication of his book *The Sorcerer's Drum*.  James spent approximately $999.00 on the package, which offered basic services.  James purchased this package over the phone and did not receive a Publishing Agreement at the time of his purchase.  James could not find any document outlining his legal obligations on Defendants' website.  On May 4, 2009, James requested a copy of his contract via email and received one.

40.     James was reassigned PSAs on numerous occasions and was unable to keep track of whom to contact.  This caused unnecessary delays.

---

[3] *Id.*

41.     *The Sorcerer's Drum* was published on or about June 18, 2009.   Many errors appeared in the published version of James's work that were not in the final manuscript James himself submitted.   Some lines appeared in all capital letters, while other lines were repeated. Other formatting issues riddled his book.

42.     James was disappointed with the final product and contacted iUniverse via telephone, requesting that the mistakes be corrected.   His PSA responded that correcting such mistakes would cost James several hundred dollars.   James opted not to spend the money to fix the errors.   The errors remain in his published book.

43.     In the summer of 2010, James decided to self-publish a second book.   Over the telephone, James had been reassured by a Marketing Consultant that iUniverse's practices had improved and that he would not encounter the same setbacks as he had in publishing his first work.   Since he was unaware of any other self-publishing options, he decided to purchase another Publishing Package with more Services, including the Editorial Evaluation service.

44.     On August 31, 2010, he purchased the "Premier" package for the publication of his book *Web of Freedom*.   He purchased the package over the telephone with iUniverse and sent in his payment by mail.   This Publishing Package included an Editorial Evaluation and made James eligible for iUniverse's "Recognition Programs," such as "Editor's Choice" and "Rising Star."

45.     Sold separately, the Editorial Evaluation service costs $599.   iUniverse markets the Editorial Evaluation as a "diagnostic tool" to help authors determine how to improve their manuscripts.   In essence, the service provides another list of expensive services iUniverse recommends to authors, such as Copyediting ($.022 per word) to Content Editing Plus ($0.042

per word).[4]     The Editorial Evaluation also determines whether the author will receive iUniverse's Editor's Choice designation.

46.     If an author is accepted into the Editor's Choice program, an icon appears on the back cover of the author's book denoting that the book is part of the program.

47.     James submitted his manuscript in November 2010 for an Editorial Evaluation. In mid-November, James received his Editorial Evaluation, which resulted in the usual canned result:

> Your manuscript has many of the basic elements required in today's publishing marketplace, but it is the opinion of the Editorial Board that the Editor's Choice designation cannot be awarded without additional revision. Editor's Choice is still a possibility if the editorial services recommended in the Editorial Rx Referral in your Editorial Evaluation are completed satisfactorily.

48.     The Editoral Evaluation recommended the following services in order to improve his manuscript and make him eligible for "Editor's Choice," but it did not quote the prices: a Developmental Edit, which includes a Content Edit and a Quality Review, and a Cover Copy Polish.  At a minimum, the Evaluation recommended the Line Editing and Cover Copy Polish services.

49.     James did not purchase any of the recommended services.

50.     Despite iUniverse's representations on its website and its emails, iUniverse was slow to push Mr. James's manuscript through to publication. By December 15, 2010, James had heard nothing further from iUniverse and emailed his Check-In Coordinator regarding the status of his book.  His Check-In Coordinator informed him that she would review his materials before submitting them to the design team, the last phase before printing.  But a month later, he still had

---

[4] For a novel of an average length of 80,000 words, the Copyediting service would cost $1,760.00 and the Content Editing Plus would cost $3,360.00

not heard anything about the status of his manuscript. At this point, James began calling his representative at iUniverse every other day or at least twice a week. No one answered his calls or responded to him even though he still received sales calls to purchase Services.

51.     On January 18, 2011, James emailed the same Check-In Coordinator for another update, but he received a response from a different iUniverse representative from the "Editorial Department" who informed him that he should consider further editing: in other words, that he should purchase more Services.

52.     James grew frustrated with the delays. On February 2, 2011, James was assigned yet another PSA to help him push his manuscript through the design stage. On February 11, 2011, James received electronic proofs of his book. He was also informed that his book would be priced at $20.95. However, as James was reviewing the proof, he realized that iUniverse had not used his final manuscript and had instead used an earlier draft. This caused further delays.

53.     James's second book *Web of Freedom* was finally published in or about April 2011. His second book was also riddled with publisher errors.

54.     In March 2011, James grew concerned that he had not received any sales statements or payments for his first book *Sorcerer's Drum*. He called his representative at iUniverse and inquired as to the status of his sales. They reported that he had made no sales. James knew that he had sold at least forty books to his friends and family, who had either contacted him to tell him that they purchased the book or who had physically sent him a copy they had purchased for him to sign and send back. James also knew that he had sold eBooks. He had also sold his second book *Web of Freedom* to friends and family but received no royalties or sales reports for that book either.

55.     In a telephone conversation, iUniverse admitted to James that the company had

numerous problems with reporting its sales statements and making royalty payments.

56.     In fact, in an email dated April 8, 2011, James's PSA informed him that iUniverse was "now working to fix the sales and royalties report" for James's book, promising to update James on Monday, April 11, 2011.   On Tuesday, April 12, 2011, James had still not heard anything from iUniverse and emailed his PSA again to inquire whether she had any information on his "sales records . . . that seemed to be lost."   James's PSA responded that James's agent, Christopher James (Plaintiff's son), would be able to view "the Sales and Royalties" report for his book.

57.     On January 23, 2012, James finally received a royalty payment for his *first* book, without any sales report, in the amount of $6.92.   The check indicated that the payment was for "Q2" 2011 royalties.   This was the only royalty check James ever received for either of his works.

58.     James repeatedly contacted iUniverse Customer Support for an explanation with respect to his appallingly small royalty payment.   On February 6, 2012, he received an emailing "apologiz[ing] for the inconvenience this may have caused you.  I understand that you need to be able to get these sales reports for your reference . . ."

59.     Upon receiving the check, James attempted to terminate his relationship with iUniverse but was unable to do so and was instead instructed on the proper procedure for contract termination.   James finally terminated his publishing agreement with iUniverse on March 21, 2012.  James's books are still available on Amazon for purchase on Kindle.

## Foster Allegations

60.     Foster researched self-publishing her book with either Xlibris or iUniverse.   She ultimately decided not to publish with Xlibris in order to avoid publishing with an Author

Solutions imprint.  She did not realize that iUniverse was also an Author Solutions imprint.

61.    In June of 2009, Foster contacted iUniverse to discuss the possibility of self-publishing through them.   On June 17, 2009, she received an email from a Publishing Consultant, promising: "When you decide to work with iUniverse, not only will we get your manuscript into print and out to your intended audience, *but we'll also ensure that your book is polished and presented in a way that is highly competitive for the marketplace*." (Emphasis added.)

62.    Foster decided to publish with iUniverse, and in or around March 2010, she purchased the "Bookstore Premier Pro" package for $1,499.00 for the publication of her book *Forgotten Burial: A Restless Spirit's Plea for Justice*.  The package came with various services and made her eligible for iUniverse's Recognition Programs, such as Editor's Choice and Rising Star.

63.    Foster purchased the package over the phone from iUniverse.  An hour after she made the purchase, she received an email that included her publishing agreement.  iUniverse requested that she respond to the email by saying:

> **YES, I have read and accept all the terms of the Publishing Agreement.**
> **YES, I accept author warranties and indemnification.**

64.    Foster responded to the email shortly thereafter, accepting the terms of the Publishing Agreement.

65.    On July 21, 2010, Foster was informed by a PSA that a Check-In Coordinator had been assigned to assist her through the process of submitting a manuscript. On July 30, 2010, Foster was assigned a new Check-In Coodinator.

66.    On August 10, 2010, Foster submitted her manuscript for an Editorial Evaluation, which was completed on August 13, 2010.

14

67.   Her Editorial Evaluation resulted in the following canned result (emphasis added):

Your manuscript has many of the basic elements required in today's publishing marketplace, *but it is the opinion of the Editorial Board that the Editor's Choice designation cannot be awarded without additional revision.* Editor's Choice is still a possibility if the editorial services recommended in the Editorial Rx Referral in your Editorial Evaluation are completed satisfactorily.

68.   The Editorial Evaluation recommended the following services but did not quote prices: a Developmental Edit, which includes a Content Edit, a Quality Review, and a Cover Copy Polish, which was included in the original publishing package she purchased. The Evaluation further recommend that Foster then *resubmit* the manuscript for another Editorial Evaluation at a reduced cost (list price $599.00), but again no price was quoted. At a minimum, the referral recommended Line Editing ($0.029 per word) and Cover Copy Polish.

69.   On August 13, 2010, Foster received a long and confusing email assigning her an Editorial Consultant and stating that she had been "flagged as a possible Editor's choice title." The Editor's Choice designation appealed to Foster. The email claimed that "[t]he most significant benefit of Editor's Choice is the leverage it provides for increasing book sales," and eligibility for the Rising Star program. The email also quoted an estimate for a Developmental Edit in the amount of $4,196.25.

70.   Around this time, Foster began receiving several phone calls from her Editorial Consultant, who explained to Foster that her book had enormous potential and that her book would sell. The Editorial Consultant repeated that she wanted to see Foster's book receive the Editor's Choice designation, which would significantly help promote her book and generate book sales. To receive this designation, Foster was required to purchase the editing services. Foster decided to purchase the services with the understanding that it would improve her book and award her the Editor's Choice designation, which would provide exposure.

71.    Since Foster was unable to pay for the service at the time, she informed her Editorial Consultant that she would have to wait a few months to acquire the money. Foster was unable to acquire the money until early March 2011, at which time she paid in full for the Developmental Edit. She purchased the Development Edit on or about March 4, 2011.

72.    The purpose of the Developmental Edit was to assist Foster "with structural work such as [point of view] and characterization." It also included a Content Edit to "address grammatical errors and dialogue attribution and formatting" and a Quality Review "to ensure that the manuscript is editorially sound before it goes into production."

73.    Foster expressed that she wished to have her book ready approximately three months before Halloween 2011, in late July 2011, since her book dealt with the paranormal and could easily be marketed around that season. Her Editorial Consultant reassured her that her book would be out by that time.

74.    The entire Developmental Edit process, which included a Content Edit and Quality Review, took almost two months, from March 4, 2011 until April 27, 2011, at which time Foster's manuscript was finally submitted to the Editorial Review Board for Editor's Choice Consideration. iUniverse refused to provide any information as to the names, backgrounds, or qualifications of the Review Board, or even how many people sat on the board.

75.    On May 2, 2011, Foster was notified that her book had received the Editor's Choice designation. On or about June 1, 2011, Foster grew concerned about the benefits of the Rising Star program, particularly with respect to the marketing services it would provide. She contacted her PSA by telephone. On June 2, 2011, Foster was informed that she received the Rising Star designation.

76.    The Rising Star Board finally responded to her inquiries on June 21, 2011,

explaining that the benefits included free book returnability, the Rising Star logo, and the chance to have her title presented to "national retail, whosesale and independent book accounts." However, the email was unclear and did not explain the nature of the benefits.

77.     The email also indicated that "[i]f you purchased marketing services or your marketing plan was based on services offered by iUniverse and you decide to cancel or do not purchase mentioned services indicated in your Rising Star Marketing Survey or to your Marketing Consultant, the Rising Star distinction will be removed from your title." This requirement was also unclear to Foster.

78.     In speaking with her Marketing Consultant, Foster understood this sentence to mean that she would have to buy a marketing package for $3,999.00, or she would risk losing her Rising Star designation.

79.     Foster grew concerned and asked why she was required to buy additional marketing services if the very purpose of Editor's Choice and Rising Star were to market her book.  The Marketing Consultant explained that this was the policy and procedure of the company.  He reaffirmed that Rising Star was prestigious.  Foster did not wish to lose her Rising Star designation and purchased the package, which she reasonably believed would generate media attention and book sales.

80.     Foster purchased the Marketing Package for $3,999.00 and was assigned a "publicist" who subcontracted with iUniverse.

81.     Foster's publication date had already been delayed on several occasions.  She realized that her book would not be on the market by the end of July 2011 and grew increasingly concerned that her book would not even be on the market by September 1, 2011.  She called iUniverse regularly, at least twice a week, to check on the status of her book and to push it

through to publication.

82.    On August 3, 2011, Foster received an email from her PSA who informed her that her book would not be on the market by September 1, 2011.  While the book was completed and sent to print by September 1, 2011, it was not available for purchase until eight weeks later.  This delay defeated the very benefit of self-publishing through iUniverse and undermined the value of the $4,000.00 marketing package that she purchased.  This delay alone resulted in significant lost sales, as her book was not available in the weeks before Halloween.

83.    Foster also noticed that her book contained several publisher errors, such as odd formatting of paragraphs and grammar mistakes, whereby a comma should have been a period. The Developmental Edit, for which she paid $4,196.00, which included a Content Edit and a Quality Review, promised to correct such mistakes but failed to do so.

84.    Once her book came on the market, her "publicist" was to begin a six week marketing campaign.  Foster was unable to determine any efforts made by her publicist and soon discovered that the marketing service was worthless, as it simply did not provide the services promised, such as radio interviews and media coverage.  Foster demanded a refund from Eugene Hopkins, a client services manager, who finally refunded her money for the marketing package in March 2012.

85.    Foster soon began realizing that her royalty statements and sales reports were inaccurate.  For instance, iUniverse incorrectly reported the number of books Barnes & Noble purchased for her book signing.  When Foster called iUniverse to complain, iUniverse simply stated that they did not know why the report was incorrect.  Each phone call to iUniverse took significant time.

86.    In June 2012, Foster received a royalty check from iUniverse in the amount of

$41.92, withholding $16.30 in taxes.  However, her sales report that she accessed online indicated that she had earned $81.93.  In another phone call with Eugene Hopkins at iUniverse, a client services manager, he was unable to explain the mistake.  She was eventually sent a check for approximately $20.00 to recover the discrepancy, but this process alone took significant time.

87.     Despite iUniverse's egregious mistakes in publishing and marketing, Foster's book received significant local media attention due to her own efforts.  The SciFi channel contacted Foster directly, requesting to make a docudrama out of her book, which would greatly impact her sales.  She informed iUniverse of this news, but they did not act on it.

88.     Foster demanded a full refund, which she did not receive.  She terminated her agreement with iUniverse in or about June 2012.

**Hardy Allegations**

89.     Hardy published three books with AuthorHouse in November 2010, May 2011, and April 2012.  Hardy decided to use a self-publisher to publish books on technical issues in his field in a timely manner.  He edited each of his books scrupulously before submission and provided AuthorHouse with a print-ready file that they could not alter.  Hardy used AuthorHouse primarily as the printer and distributor of his book.

90.     For his third book, Hardy purchased the Legacy New package for $474.50.  Hardy never received a Publishing Agreement but is able to view one on his online account with AuthorHouse.

91.     Except for inconsistent printing quality and poor customer support, Hardy did not experience any major difficulties with his first two books.  However, he has been unable to collect any royalties whatsoever on his third book, published one year ago.

92.     Each of the royalty statements for his third book reports "[n]o sales found for this

project." This report is incorrect and AuthorHouse has failed to provide Hardy with any further information.

93.     In September 2012, Hardy first emailed AuthorHouse's customer support team to inquire why he had received no royalties when he knows his colleagues had bought the book. AuthorHouse explained to him that any purchases made in July or August would not yet have been reported. While Hardy believed that one of his colleagues had purchased the book in June, he decided to wait.

94.     By December 2012, still no royalties had appeared.  Hardy wrote to customer service again, explaining that he had written numerous times that he "believe[d] that [AuthorHouse] ha[s] stopped responding to my requests for information."   He outlined the reasons why his statements showing no sales were utterly inaccurate.

95.     He explained that over the summer, his book had achieved "Amazon Best Sellers Rank" on Amazon.com.  It is impossible to appear on this list without selling a single book.   But Hardy received no response to this point.

96.     Hardy also explained that several colleagues had purchased the book.  In fact, one of Hardy's colleagues produced a receipt from Amazon and a spreadsheet detailing all relevant information, including Amazon's order ID.  This sale was made in November 2012 and should have been reported in his fourth quarter statement of 2012.  After Hardy received the statement in March 2013, and the book for which he had documentation did not appear, he contacted AuthorHouse again on March 9, 2013 to demand an explanation.

97.     Hardy still has received no royalties for his third book.  Nor has he received any explanation as to why.

## V.     CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this action as a class action pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves individually and all others similarly situated who have purchased Publishing Packages and/or Services from Defendants (the "Class") since April 26, 2007 (the "Class Period").

99.     Excluded from the class are Defendants, Defendants' employees and any entity in which the Defendants have a controlling interest, and their legal representatives, officers, directors, assignees and successors.

100.    Plaintiffs also bring this action on behalf of a subclass of all people who have purchased Publishing Packages and/or Services in conjunction with their literary work(s) and are residents of California and New York.  Excluded from the Class are Defendants, Defendants' employees and any entity in which the Defendants have a controlling interest, and their legal representatives, officers, directors, assignees and successors.

**Subclasses**

**California:** All persons residing in California who purchased a Publishing Package and/or Services from Defendants in conjunction with their literary work(s) since April 26, 2009.

**New York:** All persons residing in New York who purchased a Publishing Package and/or Services from Defendants in conjunction with their literary work(s) since April 26, 2010.

101.    **Numerosity/Impracticability of Joinder**: The members of the Class are so numerous that joinder of all members would be impracticable.  In 2011 alone, Defendants sold 27,500 Publishing Packages to authors.   The precise number of Class members can be ascertained by reviewing documents in Defendants' possession, custody, and control.

102.    **Commonality and Predominance**: There are common questions of law and fact which predominate over any questions affecting only individual members of the Class.  These

common legal and factual questions include, but are not limited to, the following:

    (a)    Whether Defendants misled Plaintiffs and the Class;

    (b)    Whether Defendants' representations that it is an independent publisher has the capacity, tendency, or effect of deceiving or misleading consumers;

    (c)    Whether Defendants' representations of its Publishing Packages or Services have the capacity, tendency, or effect of deceiving or misleading consumers;

    (d)    Whether Defendants' representations of its Publishing Packages or Services services suggest a sponsorship, approval, status, affiliation, or connection which it does not have;

    (e)    Whether Plaintiffs and the Class were injured as a result of Defendants' deceptive conduct;

    (f)    Whether Plaintiffs and the Class have conferred a benefit upon Defendants;

    (g)    Whether it is inequitable for Defendants to retain the publishing rights of Plaintiffs and members of the proposed class;

    (h)    Whether it is inequitable for Defendants to retain payment for services that it misrepresented or failed to carry out;

    (i)    Whether, as a result of Defendants' conduct, Plaintiffs and the Class have suffered damages; and if so the appropriate amount;

    (i)    Whether Defendants acted in such a manner as to prevent Plaintiffs and members of the Class from receiving the benefits of their contract;

    (j)    Whether Defendants have failed to pay Plaintiffs and members of the Class their earned royalties in breach of their Publishing Agreement;

    (k)    Whether Defendants' conduct violated the California Unfair Competition Law;

    (l)    Whether Defendants' conduct violated the California Business and Professions Code; and

    (m)    Whether Defendants' conduct violated the New York General Business Law.

103.    **Typicality**: The Plaintiffs' claims are typical of the claims of the members of the

Class.  Plaintiffs and all Class members have been injured by the same wrongful practices in

which Defendants have engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of all Class members and are based on the same legal theories.

104. **Adequacy**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflicting with the Class.

105. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. The individual damages incurred by each Class member resulting from Defendants' wrongful conduct are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Defendants have acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

106.    Plaintiffs and the Class do not anticipate any difficulty in the management of this litigation.

## COUNT ONE
## BREACH OF CONTRACT

107.    Plaintiffs  repeat and reallege the allegations set forth herein and further allege:

108.    Plaintiffs and the other members of the Class all purchased Publishing Packages and/or other Services from Defendants during the Class Period.

109.    At all material times, Defendants have made representations on their website, publishing agreement, email correspondence with its authors, other written materials, and through telephone communications, falsely claiming that it would pay its authors royalties per the terms of their Publishing Agreements.

110.    The material contract terms outlining royalties for Plaintiffs and members of the Class are as follows:

a.      That Defendants would make four royalty payments per year if the author earned a certain dollar amount in royalties.  If the author did not, Defendants would apply the balance to the following quarter.

b.      With respect to print royalties, that Defendants would pay the author either 10% or 20% "of the payments PUBLISHER actually receives from sales of printed copies of the WORK, less any taxes, shipping charges and returns unless AUTHOR has purchased the Booksellers Return Program."  Authors receive an extra 5% if sales were made through Barnes & Noble.

c.      With respect to eBook royalties, authors would receive 50% of the payments Defendants "actually receive[] from the sales of eBook copies of the WORK, less any distribution and technology fees, taxes and returns."

111.    Defendants have failed to pay Plaintiffs and members of the Class their earned royalties in breach of their Publishing Agreements and have failed to provide authors accurate sales statements.

**COUNT TWO**
**UNJUST ENRICHMENT**

112.    Plaintiffs repeat and reallege the allegations set forth herein and further allege:

113.    Plaintiffs and the Class have conferred a benefit upon Defendants in the form of earned royalties that Defendants have failed to pay, or in the form of payment for one or more of the Services Defendants sold and failed to provide either in whole or in part.

114.    Defendant has also retained payments from Plaintiffs and members of the Class for Services that were not fulfilled properly relating to the publication, production or promotion of their books.

115.    Defendants have represented themselves as an independent publisher, rather than a vanity press.   As such, it created the expectation that it would provide diligent service to Plaintiffs and members of the Class.

116.    Instead, Defendants have benefitted from failing to provide diligent and careful service to Plaintiffs and members of the Class.   The books are not properly edited, even after the purchase of expensive editing services, publication is delayed, and the books are not properly marketed.   Defendants also fail to pay royalties and provide accurate royalty statements. Defendants have further benefitted by continuing to sell books online, even after Plaintiff and members of the Class have terminated their Publishing Agreement with Defendants.

117.    It is inequitable for Defendants to retain royalties earned and due to Plaintiffs and members of the Class and to retain payment for Services that Defendants failed to carry out as promised.

## COUNT THREE
## CALIFORNIA BUSINESS AND PROFESSIONS CODE
## (CAL. BUS. & PROF. CODE § 17500, ET. SEQ. – Untrue Advertising)
### (California Subclass)

118.    Foster repeats and realleges the allegations set forth herein and further alleges:

119.    Foster asserts this cause of action for violations of California Business and Professions Code § 17500, *et seq.*, for untrue advertising against Defendants.

120.    At all material times, Defendants have marketed themselves as an independent publisher with a reputation for outstanding quality and for impressive book sales.  Defendants have also marketed themselves as an independent publisher designed to offer its authors the same quality product as a traditional publisher, for a fee, but with greater speed, higher royalties, and more control for its authors.

121.    Defendants have made these representations on their website, email correspondence with its authors, other written materials, and through telephone communications with Foster and members of the Class.

122.    Instead, Defendants are not an independent publisher but a print-on-demand vanity press that profits from delaying publication, publishing manuscripts with errors to generate fees, and selling worthless services, or services that fail to accomplish what they promise, to its authors.

123.    At all material times, Defendants sold publishing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such services could create a book of equal quality to that of a traditional publisher.

124.    At all material times, Defendants sold marketing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such services would enhance an author's reputation or increase book sales.

125.    Consumers, including Foster and members of the California Class, necessarily and reasonably relied on Defendants' statements.

126.    Consumers, including Foster and members of the California Class, were among the intended targets of these representations and statements.

127.    The above acts of Defendants, in disseminating said misleading and deceptive representations and statements throughout the State of California to consumers, including to Foster and members of the California Class, were and are likely to deceive reasonable consumers by obfuscating the nature of Defendants' business practices, all in violation of the "untrue" prong of California Business and Professions Code § 17500, *et seq.*

128.    Foster and members of the California Class, pursuant to California Business and Professions Code § 17535, are entitled to an order of this Court enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore to any person in interest any money paid to Defendants as a result of its deceptive marketing scheme.

## COUNT FOUR
## CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200, ET. SEQ. – Unlawful Business Acts and Practices)
(California Subclass)

129.    Foster repeats and realleges the allegations set forth herein and further alleges:

130.    Such acts of Defendants, as described herein, and each of them, constitute unlawful business acts and practices.

131.    Marketing and advertising itself as an independent publisher invested in creating quality titles when, in fact, Defendants are a print-on-demand vanity press is unlawful.

132.    Selling services marketed to promote or market books when, in fact, such services are not reasonably designed to market or promote books written by Foster and members of the

California Class is unlawful.

133.    The business practices alleged above have hurt the general public.

134.    The business practices alleged above are unlawful under Business and Professions Code § 17200, *et seq.* by virtue of violating Business and Professions Code § 17500, *et seq.*, which forbids untrue advertising and misleading advertising.

135.    As a result of the wrongful business practices described above, Foster and members of the California Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendants and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for the products as a result of the wrongful conduct alleged herein.

136.    The above-described unlawful business acts and practices of Defendants present a reasonable likelihood of deception to Foster and members of the California Class in that Defendants have systematically perpetrated and continues to perpetrate such acts or practices upon members of the California Class by means of misleading advertising and marketing.

**COUNT FIVE**
**CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET. SEQ. – Unfair Business Acts and Practices)**
(California Subclass)

137.    Foster repeats and realleges the allegations set forth herein and further alleges:

138.    Such acts of Defendants, as described herein, and each of them, constitute unfair business acts and practices.

139.    Foster, and other members of the California Class, suffered a substantial injury by purchasing publishing packages and/or publishing or marketing services from Defendants that they would not have bought absent Defendants' unfair advertising.

140.    The business practices alleged above have hurt the general public.

141.    Defendants' conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

142.    Defendants aggressively lure authors into purchasing expensive publishing packages and/or services with the promise of creating a professionally published book and/or marketing plan to increase sales. These books could otherwise have been published through vanity presses or other self-publishing companies.

143.    Defendants instead fail to take the basic care of a publisher, such as ensuring proper formatting, eliminating publisher errors or glaring typographical mistakes, and carrying out marketing services that it sells its authors. In fact, Defendants profit from delaying publication of books to sell authors more services and by either failing to correct or making new errors in books that can be fixed only for fee.

144.    There is no benefit to consumers or competition by falsely advertising that Defendants operates as an independent publisher and by failing to disclose the true nature of its business. Indeed, the harm to the consumers and competition is substantial.

145.    As a result of the business acts and practices described above, Foster and members of the California Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for Defendants' services as a result of the wrongful conduct of Defendants.

**COUNT SIX**
**CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET. SEQ. – Fraudulent Business Acts and Practices)**
(California Subclass)

146.    Foster repeats and realleges the allegations set forth herein and further alleges:

147.    Such acts of Defendants as described herein, and each of them, constitute fraudulent business practices under California Business and Professions Code § 17200, *et seq.*

148.    As more fully described herein, Defendants marketed themselves as an independent publisher designed to offer its authors the same quality product as a traditional publisher, for a fee, but with greater speed, higher royalties, and more control for its authors. Instead, Defendants operate a print-on-demand vanity press that profits from delaying publication, publishing manuscripts with errors to generate fees, and selling worthless services, or services that fail to accomplish what they promise, to its authors.

149.    Defendants fail to take the basic care of a publisher, such as ensuring proper formatting, eliminating publisher errors and glaring typographical mistakes, and paying its authors earned royalties.

150.    The business practices alleged above have hurt the general public.

151.    Foster and other members of the California Class were deceived into purchasing expensive Publishing Packages and/or other Services from a company who profits not by creating quality books and generating significant book sales to a general readership, but from selling worthless services to its own authors.

152.    Said acts are fraudulent business acts and practices.

153.    As a result of these fraudulent business acts and practices, Foster and members of the California Class were misled into purchasing expensive Publishing Packages and/or worthless Services.

154.    As a result of the business acts and practices described herein, Foster and members of the California Class, pursuant to Business and Professions Code § 17203, are

entitled to an order enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for the services at issue as a result of the wrongful conduct of Defendants.

**COUNT SEVEN**
**NEW YORK GENERAL BUSINESS LAW: DECEPTIVE ACTS AND PRACTICES**
**(N.Y. GBS. LAW § 349)**
(New York Subclass)

155.    James repeats and realleges the allegations set forth herein and further alleges:

156.    NY GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

157.    As alleged herein, Defendants engaged in deceptive acts and practices that affect consumers at large and violated NY GBL § 349(a).

158.    Defendants' conduct was consumer oriented in that James and the Class are "persons" within the meaning of NY GBL § 349(h).

159.    At all material times, Defendants' representations on its website, its publishing contract, its email correspondence with its authors and other materials falsely claim or convey the false impression that Defendants are an independent publisher in the business of creating quality books, giving authors more control over their work and higher royalty percentages, and generating marketing opportunities for its consumers.  But this is not the case.

160.    James and other members of the New York Class were deceived into purchasing expensive Publishing Packages and/or other Services from a company who profits not by creating quality books and generating significant book sales to a general readership, but from operating as a print-on-demand vanity press that profits from delaying publication, publishing

manuscripts with errors to generate fees, and selling worthless services, or services that fail to accomplish what they promise, to its authors.

161.     Defendants fail to take the basic care of a publisher, such as ensuring proper formatting, eliminating publisher errors and glaring typographical mistakes, and paying its authors earned royalties.

162.     Defendants' unfair and deceptive trade acts have caused damages and injury to James and the Class.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs, on behalf of themselves and the other members of the Class, respectfully pray:

A.  That the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action be given to the class;

B.   That the Court order Defendants to release the publication rights of Plaintiffs and all Class members who so desire;

C.  That the Court award the Plaintiffs and the Class compensatory damages believed to exceed $5,000,000, including any additional monies paid by Class members for the purchase of any services sold by Defendants that were not delivered, either in whole or in part.

D.  That Plaintiffs and the Class recover damages determined to have been sustained by them, and that judgment be entered against Defendants in favor of the Class;

E.   That Plaintiffs and the class recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorney fees as provided by law;

F.   That Defendants be ordered to pay restitution to Plaintiffs and the Class; and

G.  That Plaintiffs and the Class be granted such other, further relief as may be determined to be just, equitable and proper by this Court, including but not limited to punitive damages and that the Court order such other and further relief as the Court deems just, necessary, and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: New York, New York
      April 26, 2013

Oren Giskan
O. Iliana Konidaris
GISKAN SOLOTAROFF ANDERSON &
    STEWART LLP
11 Broadway, Suite 2150
New York, NY 10004
Telephone:  (212) 847-8315
ogiskan@gslawny.com
ikonidaris@gslawny.com