UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
KELVIN JAMES, MARY SIMMONS, and JODI FOSTER,
on behalf of themselves and all others similarly situated,

                                Plaintiffs,                    Index No. 13-CV-2801 (DLC)
                                                                            ECF Case

            -against-

PENGUIN GROUP (USA) INC. and
AUTHOR SOLUTIONS,

                                Defendants.
-------------------------------------------------------------------x

## SECOND AMENDED CLASS ACTION COMPLAINT

1.         Plaintiffs Kelvin James, Mary Simmons, and Jodi Foster (collectively "Plaintiffs")[1] on their own behalf and on behalf of all others similarly situated ("Class"), bring this class action against Defendant Penguin Group (USA) LLC ("Penguin" or "Defendant"), and Author Solutions LLC, a Penguin company ("Author Solutions") (collectively "Defendants"), pursuant to California's Unfair Competition Law, Business and Professions Code §§ 17200, *et seq.*, 17500, *et seq.*, ("UCL"), the New York General Business Law, N.Y. GBS. LAW § 349 ("NY GBL"), the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105 (1)(u), and common law.

2.         Digital and print-on-demand technology has changed the nature of print publishing, creating a burgeoning self-publishing industry.

3.         By its own estimation, Author Solutions, a leader in the self-publishing industry, has worked with over 170,000 authors and created over 200,000 new book titles since its inception in 2007.  Author Solutions was acquired by Penguin, a well-respected traditional

---

[1]     Plaintiff Terry Hardy is dismissed without prejudice by stipulation of the Parties.

publisher, in July 2012.

4.        On its website and in its communications, Author Solutions touts that it is an "indie publisher," suggesting that it is a small, independently run press, when this is far from the case.  In truth, Author Solutions is a global "business-to-consumer print-on-demand"[2] company.

5.        Authors Solutions' scheme is simple: it sells authors expensive publishing packages, loaded with bogus services, for the publication of their books and then pressures those authors into buying more, equally bogus marketing and publishing services.  If authors refuse to buy those services, Authors Solutions delays publication of the authors' books until they do.

6.        In fact, in 2011, Author Solutions estimated that two-thirds of its earnings were derived from various services sold to its authors and that each author generates approximately $5,000.00, on average, for the company.  Author Solutions' interests thus lie directly in tension with its author's, since the author herself serves as the company's most profitable consumer -- not the author's readers.  In other words, Author Solutions makes money from authors, not for them.

7.        Authors who purchase publishing packages from Author Solutions routinely complain of the same bad practices:

        a.        Author Solutions fails to pay their earned royalties and provide accurate sales statements;

        b.        Author Solutions induces them to purchase scam editorial services, whose sole purpose is to induce them to purchase additional editorial services.

        c.        Author Solutions promotes and sells marketing services that provide no benefit. When authors resist, Author Solutions delays publication until they relent.

---

[2] Description at bottom of page in "About iUniverse," IUNIVERSE, iuniverse.com (last visited July 16, 2013, 6:00 PM).

8.            In their Motion to Dismiss Plaintiffs' Class Action Complaint, Defendants state

the practices alleged herein are merely "a series of gripes" made by a few disgruntled authors.

This is not the case: Authors have taken to social media, blogs, and the Internet to publicize their

complaints against Author Solutions.[3]   Plaintiffs' counsel has been contacted by over 100

authors, complaining of the same practices alleged herein.

9.            Author Solutions ultimately fails at the most basic tasks of a publisher by

focusing on ways to profit from its authors instead of ways to deliver authors what it promises:

"professionally and affordably" published books that are "primed for retail success." [4]

## I.  <u>JURISDICTION AND VENUE</u>

10.            This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28

U.S.C. §§ 1332(d), because the matter in controversy in this class action exceeds $5,000,000,

exclusive of interest and costs, and attorney's fees.

11.            Venue is proper in this District inasmuch as Defendant Penguin maintains its

offices and conducts business in this District, Plaintiff James resides in this district, and a

significant number of members of the Class live in this District.

## II.  <u>THE PARTIES</u>

12.            Plaintiff James is a resident of New York, New York.  In or around April 2009,

James purchased the "Select" package to commence his publishing relationship with iUniverse

for his book *The Sorcerer's Drum*.  James spent approximately $1,000.00 on the package.  The

book was published on or about June 18, 2009.  In September 2010, James purchased a second

---

[3] *See, e.g.,* 36 author complaints, PISSED CONSUMER, http://www.pissedconsumer.com/reviews-by-company/iuniverse.html (last visited July 19, 2013); RIPOFF REPORT, 20 author complaints, http://www.ripoffreport.com/reports/directory/iuniverse (last visited July 19, 2013); Emily Suess, SUESS'S PIECES, http://blog.emilysuess.com/tag/author-solutions/ (last visited July 19, 2013).

[4] Description under heading "Get primed for retail success," IUNIVERSE, iuniverse.com (last visited July 16, 2013, 6:00 PM).

package with iUniverse, the "Premier" package, for his book *Web of Freedom*. The book was published on or about April 2011. James terminated his publishing agreement ("Publishing Agreement") with iUniverse on March 21, 2012.

13.     Plaintiff Simmons is a resident of Hotchkiss, Colorado. In or around May 31, 2011, Plaintiff Simmons purchased a "Bookstore Premier Pro" publishing package from iUniverse for $1,079.50 for the publication of her book, *Corvus Rising: Book One*. In May 2012, Plaintiff Simmons purchased a Developmental Edit for $4,659.78. In October 2012, Plaintiff Simmons purchased an editing service in the amount of $1049. In December 2012, Plaintiff Simmons purchased a marketing package for $13,600. Plaintiff Simmons also purchased several additional editing services as the word count of her book increased, which each cost between $50-$400 at a time. In total, Plaintiff Simmons spent approximately $21,000 for the publication of her work with iUniverse. Plaintiff Simmons terminated her Publishing Agreement with iUniverse in or about August 2013.

14.     Plaintiff Foster is a resident of Chico, California. In or around March 2010, Plaintiff Foster purchased the "Bookstore Premier Pro" publishing package from iUniverse for $1,499.00 for the publication of her book *Forgotten Burial: A Restless Spirit's Plea for Justice*. In March 2011, Plaintiff Foster purchased the Development Edit service from iUniverse for $4,196.25. Plaintiff Foster terminated her Publishing Agreement with iUniverse in or about June 2012.

15.     Defendant Author Solutions LLC, previously Author Solutions, Inc., is a corporation based in Bloomington, Indiana. It is owned by Pearson PLC and is a member of Penguin Group (USA) LLC and operated by Penguin Group (USA) LLC. It controls many imprints, including AuthorHouse, iUniverse, and Xlibris and depicts itself as an "indie

publisher."

16.         Defendant Penguin Group (USA) LLC, formerly Penguin Group (USA) Inc., is a

publishing company, with its headquarters in New York, New York.  On July 1, 2013, Penguin

and Random LLC completed a merger.  The company is now Penguin Random House.

### III. STATEMENT OF FACTS

17.         In 2011, Author Solutions reported to have sold 27,500 "publishing packages."

These packages ("Publishing Packages") initiate the relationship between the author and Author

Solutions and often include a bundle of Services.  They range in price from several hundred to

several thousands of dollars.

18.         Author Solutions maintains a growing number of imprints ("Imprints"), including

AuthorHouse, Balboa, iUniverse, Palibrio, Trafford, and Xlibris.  Author Solutions employs

several tactics to lure authors into publishing with one of their Imprints.  Each imprint provides

essentially the same self-publishing services.  The practices alleged herein do not differ across

the Imprints.

19.         The excessive number of Imprints serves a deceitful purpose: it gives authors the

impression that they have several self-publishing options when that is not the case.  Many

authors move from one Author Solutions Imprint to the next without realizing that it is simply

the same Author Solutions operation under a different name.

20.         Author Solutions also partners with other large publishing houses, such as

Thomas Nelson and Hay House.  For instance, Author Solutions' brand Balboa Press has

partnered with Hay House and caters to wealthier consumers, pricing its packages and services

significantly higher.  Though the packages are more expensive at Balboa, they do not differ in

any respect from the same package at Author Solutions' lower-end Imprints.  In fact, across the

Imprints, the services are performed by the same employees.

21.          Author Solutions created fake social media personas to entice authors into self-publishing with them.  For instance, Author Solutions created a fictitious employee named "Jared Silverstone," who identified himself as an "Awesome Publishing Consultant at Author Solutions" on various social media sites, such as Facebook and Twitter, and claimed to help authors with their writing and editing.  When this deceitful practice was uncovered, Author Solutions removed "Jared Silverstone" from the media sites, claiming that the fake accounts were not condoned by Author Solutions.

22.          Nonetheless, Author Solutions still maintains a number of websites designed to direct authors to publish with Author Solutions.  For instance, chooseyourpublisher.com, poetry-publishers.com, and e-bookspublishing.com are designed to resemble independent websites that help authors understand their publishing options.  All of these sites lead to the same place: an Author Solutions Imprint.

23.          In or about July 2012, Penguin acquired Author Solutions.  Penguin expressed interest in acquiring Author Solutions to access the company's data-collecting capabilities about consumers.  During the acquisition, John Makinson, the CEO of Penguin, stated that "'[t]his acquisition will allow Penguin to participate fully in perhaps the fastest-growing area of the publishing economy and gain skills in customer acquisition and data analytics that will be vital to our future.'"[5]  Makinson further mentioned that "'[Author Solutions] will give us a big lift with data analysis and online marketing.  We're gaining access to real scale, hundreds of thousands of

---

[5] *Penguin books owner Pearson buys self-publishing company Author Solutions for $116m,* THE TELEGRAPH (July 19, 2012, 2:02 PM), http://www.telegraph.co.uk/finance/newsbysector/mediatechnologyandtelecoms/media/9412013/Penguin-books-owner-Pearson-buys-self-publishing-company-Author-Solutions-for-116m.html.

customers and authors and ability to analyze across a large database.'"[6]

24.        At the time of the acquisition, Author Solutions CEO, Kevin Weiss, was to report to Makinson.  Makinson stated the two "'want to develop a global strategy and quickly identify new opportunities.'"[7]  Penguin planned for Author Solutions to expand quickly into international markets.[8]

25.        On July 1, 2013, Andrew Phillips, President of Penguin International based in Delhi, became CEO of Author Solutions, replacing Kevin Weiss.  Makinson stated that Penguin wished to fill the position with a Penguin executive in order to "'connect [Author Solutions] more closely to Penguin's curated publishing activities.'"[9]

26.        Author Solutions broadcasts Penguin's ownership on its website, over social media, and via email to lure authors into paying one of Author Solutions' many Imprints to self-publish their work with the hope of being acquired by a traditional press.

27.        Penguin lends support to this marketing campaign.  For example, Author Solutions recently issued a press release to announce the success of one of its self-published authors whose book had been acquired by Tarcher, a Penguin imprint.  In a May 2013 press release, the vice president and publisher of Tarcher stated: "Tarcher/Penguin is excited to sign up one of Author Solutions' success stories and bring it to an even wider audience."[10]

---

[6]*Pearson Acquires Self-Publishing Vendor Author Solutions for $116 Million,* PUBLISHER'S WEEKLY (July 19, 2012), http://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/53077-pearson-acquires-self-publishing-vendor-author-solutions-for-116-million.html.
[7] *Pearson Acquires Self-Publishing Vendor Author Solutions for $116 Million,* PUBLISHER'S WEEKLY (July 19, 2012), http://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/53077-pearson-acquires-self-publishing-vendor-author-solutions-for-116-million.html
[8]Paul Sonne and Jeffrey A. Trachtenberg, *Penguin Group Dices Into Self-Publishing,* WALL STREET JOURNAL, http://online.wsj.com/article/SB10000872396390444464304577537092288601370.html
[9] *Andrew Phillips Appointed CEO of Author Solutions*, AUTHOR SOLUTIONS NEWS (May 3, 2013), http://www.authorsolutions.com/News.aspx?id=1022.
[10] *Tarcher/Penguin Acquires Title from Author Solutions Imprint*, AUTHOR SOLUTIONS NEWS (May 22, 2013), http://www.authorsolutions.com/News.aspx?id=1042.

**The Self-Publishing Process**

28.          Authors initially communicate with the sales team at one of the Imprints.  The sales team has a quota for how many Publishing Packages they must sell on a monthly basis. Authors experience no difficulty in reaching a representative to discuss questions or concerns at this stage in the process.

29.          The sales team uses aggressive techniques.  For instance, the sales team often represents to authors that they will receive 20% in royalties off of the cover price of their book. Several authors purchase Publishing Packages over the telephone and do not realize that this is not the case.  In fact, authors receive royalties from what Author Solutions actually earns per book.

30.          Once an author has purchased a Publishing Package, the author then may receive a call or an email from what Author Solutions calls a Check-In Coordinator.  At other points in the process, an author will communicate with a Production Services Associate ("PSA"), a Marketing Associate/Consultant, or any other number of associates at Author Solutions, who may be based in the United States or in the Philippines.  At this point, authors experience difficulty reaching their PSA or Check-In Coordinator at Author Solutions.

31.          Authors also begin to experience significant delays in pushing their manuscript forward.  While the delay tactic hurts authors and runs contrary to the benefit of self-publishing, which Author Solutions repeatedly touts on its website and in sales calls, it benefits Author Solutions.  It allows Author Solutions more time to generate its target of $5,000.00 in revenue over the course of its relationship with an author.  This is why authors receive repeated calls from sales associates, even while authors are unable to reach their editors and push their manuscripts forward.

32.        Check-In coordinators and PSA's are instructed not to correct errors in manuscripts, even the most glaring errors.  While authors are given a chance to correct fifty of their own mistakes without a fee, this often does little to address errors, made either by the publisher or the author, in the final manuscript.

33.        Authors discover that new errors appear in the final version of their work.  When they call to complain, they have difficulty reaching their PSA's and customer support, and when they finally reach a representative, authors are told that the errors can only be corrected for a fee. In other words, Author Solutions seeks to profit from its own errors.

**Sales and Royalties Statements**

34.        Authors are either never paid according to the terms of their Publishing Agreements or have no way of knowing whether they are being paid correctly.  Authors who attempt to contact Author Solutions to understand why often have trouble reaching a representative or receiving a consistent response.  At different times, an author might be told that there was a glitch or an error, that it is simply not clear what happened, or that the author must provide proof of sales to fix the problem.

35.        Author Solutions' eBooks are typically sold uniformly at $9.99 per book.  An author is entitled to 50% of the royalties from such sales, but authors discover that here, too, they are not properly paid their royalties from eBook sales.

36.        Authors may receive different sales reports depending on the sales representative with whom they are speaking, different sales reports for the same period, or a check in a different amount from what their sales report, accessible online, has reported.

37.        Some authors are told that they have simply made no sales, even when authors have proof that this is not the case.   In fact, authors whose books become "best sellers" on

Amazon.com are still sometimes told that they have no sales.

38.        Correcting royalty payments and sales figures is a time-consuming process for authors, requiring multiple phone calls and emails.

39.        Author Solutions knows that it does not pay its authors all of their earned royalties pursuant to the terms of the Publishing Agreements and that it does not provide accurate sales statements, either because Author Solutions does not have the appropriate accounting system or database in place, or because it willfully fails to honor the Publishing Agreement.

40.        As addressed more fully herein, Plaintiffs James, Simmons, and Foster were not paid their earned royalties and were not provided with accurate sales statements.

**Services**

41.        The Author Solutions sales team is instructed to sell authors as many add-on services ("Services") as possible up front.  The publication of books is often delayed in order to increase the sale of Services, which fail to deliver authors what is promised.

42.        Prominently on its website, Author Solutions touts that "Hollywood has noticed" in an effort to promote one of its most expensive and most lucrative packages for Author Solutions: the Hollywood package.  Author Solutions claims that the Hollywood package helps authors "get their work into the hands of Hollywood entertainment executives who are looking for new ideas for film and television."  Instead, this product, which generally costs authors approximately $10,000 or more, provides Author Solutions with an easy way to profit but accomplishes essentially nothing for the author.  In 2011 alone, this package brought in $3.5 million in revenue for Author Solutions, but only *two authors* succeeded in getting their titles optioned for film or television.  Author Solutions does not disclose this fact when selling the

Hollywood package to its authors.[11]

43.         Author Solutions also sells numerous editing Services that are priced according to word count and supposedly intended to improve content and grammar.  But even after spending thousands of dollars on such a package, authors discover that their final book contains errors that either had previously been or should have been corrected.  Although Author Solutions promises individualized editorial evaluations, authors do not receive individualized editorial evaluations.  Rather, they receive the following, boilerplate pitch designed to induce them to buy more services:

> Your manuscript has many of the basic elements required in today's publishing marketplace, but it is the opinion of the Editorial Board that the Editor's Choice designation cannot be awarded without additional revision. Editor's Choice is still a possibility if the editorial services recommended in the Editorial Rx Referral in your Editorial Evaluation are completed satisfactorily.

44.         Author Solutions also aggressively sells marketing Services ostensibly designed to promote book sales.  These marketing services can costs thousands of dollars.  The package is often designed as a ninety-day campaign, but authors find that, weeks into the campaign, Author Solutions has done nothing.  When Author Solutions finally embarks on its campaign, authors receive nothing more than a handful of contacts for a bookstore, or a press kit with typographical errors that markets Author Solutions' products more than the author's book, or a five minute television slot on a local television channel with no viewers.

**Plaintiff James' Allegations**

*Fraudulent Editorial Services*

45.         Plaintiff James purchased a "Select" package from iUniverse in or around April 2009 for the publication of his book *The Sorcerer's Drum*.  Plaintiff James spent approximately

---

[11] *Id.*

$999.00 on the package, which offered basic services.  Plaintiff James purchased this package over the phone and did not receive a Publishing Agreement at the time of his purchase.  Plaintiff James could not find any document outlining his legal obligations on Defendants' website.  On May 4, 2009, Plaintiff James requested a copy of his contract via email and received one.

46.          Plaintiff James was reassigned PSAs on numerous occasions and was unable to keep track of whom to contact.  This caused unnecessary delays.

47.          *The Sorcerer's Drum* was published on or about June 18, 2009.  Many errors appeared in the published version of Plaintiff James's work that were not in the final manuscript Plaintiff James himself submitted.  Some lines of the text appeared in all capital letters, while other lines were repeated.  Other formatting issues riddled his book.

48.          Plaintiff James was disappointed with the final product and contacted iUniverse via telephone, requesting that the mistakes be corrected.  His PSA responded that correcting such mistakes would cost Plaintiff James several hundred dollars.  Plaintiff James opted not to spend the money to fix the errors.  The errors remain in his published book.

49.          In the summer of 2010, Plaintiff James decided to self-publish a second book.  Over the telephone, Plaintiff James had been reassured by a Marketing Consultant that iUniverse's practices had improved and that he would not encounter the same setbacks as he had in publishing his first work.  Since he was unaware of any other self-publishing options, he decided to purchase another Publishing Package with more Services, including the Editorial Evaluation service.

50.          On August 31, 2010, he purchased the "Premier" package for the publication of his book *Web of Freedom*.  He purchased the package over the telephone with iUniverse and sent in his payment by mail.  This Publishing Package included an Editorial Evaluation and made

Plaintiff James eligible for iUniverse's Recognition Programs.

51.          Sold separately, the Editorial Evaluation service costs $599.  iUniverse markets the Editorial Evaluation as a "diagnostic tool" to help authors determine how to improve their manuscripts.   In essence, the service provides another list of expensive services iUniverse recommends to authors, such as Copyediting ($.022 per word) to Content Editing Plus ($0.042 per word).[12]   The Editorial Evaluation also determines whether the author will receive iUniverse's Editor's Choice designation.

52.          If an author is accepted into the Editor's Choice program, an icon appears on the back cover of the author's book denoting that the book is part of the program.

53.          Plaintiff James submitted his manuscript in November 2010 for an Editorial Evaluation.  In mid-November, Plaintiff James received his Editorial Evaluation, which resulted in the usual canned result (emphasis added):

> Your manuscript has many of the basic elements required in today's publishing marketplace, *but it is the opinion of the Editorial Board that the Editor's Choice designation cannot be awarded without additional revision.* Editor's Choice is still a possibility if the editorial services recommended in the Editorial Rx Referral in your Editorial Evaluation are completed satisfactorily.

54.          No editorial board reviewed Plaintiff James' manuscript.  Furthermore, no editorial board formed the opinion that additional revisions were necessary to award the Editor's Choice designation.

55.          The Editorial Evaluation recommended the following services in order to improve his manuscript and make him eligible for "Editor's Choice": a Developmental Edit, which includes a Content Edit and a Quality Review, and a Cover Copy Polish.  At a minimum, the

---

[12] For a novel of an average length of 80,000 words, the Copyediting service would cost $1,760.00 and the Content Editing Plus would cost $3,360.00

Evaluation recommended the Line Editing and Cover Copy Polish services.

56.         Because Plaintiff James did not purchase any of the recommended services, iUniverse was slow to push Plaintiff James's manuscript through to publication.  By December 15, 2010, Plaintiff James had heard nothing further from iUniverse and emailed his Check-In Coordinator regarding the status of his book.  His Check-In Coordinator informed him that she would review his materials before submitting them to the design team, the last phase before printing.  One month later, he still had not heard anything about the status of his manuscript.  At this point, Plaintiff James began calling his representative at iUniverse every other day or at least twice a week.  No one answered his calls or responded to him even though he still received sales calls to purchase Services.

57.         On January 18, 2011, Plaintiff James emailed the same Check-In Coordinator for another update, but he received a response from a different iUniverse representative from the "Editorial Department" who informed him that he should consider further editing: in other words, that he should purchase more Services.

58.         Plaintiff James grew frustrated with the delays.  On February 2, 2011, James was assigned yet another PSA to help him push his manuscript through the design stage.   On February 11, 2011, Plaintiff James received electronic proofs of his book.  He was also informed that his book would be priced at $20.95.  However, as Plaintiff James was reviewing the proof, he realized that iUniverse had not used his final manuscript and had instead used an earlier draft. This caused further delays.

59.         Plaintiff James's second book *Web of Freedom* was finally published in or about April 2011.  His second book was also riddled with publisher errors.

*Failure to Properly Account for Royalties*

60.          In March 2011, Plaintiff James grew concerned that he had not received any sales statements or payments for his first book *Sorcerer's Drum*.  He called his representative at iUniverse and inquired as to the status of his sales.  They reported that he had made no sales. Plaintiff James knew that he had sold at least forty books to his friends and family, who had either contacted him to tell him that they purchased the book or who had physically sent him a copy they had purchased for him to sign and send back.  Plaintiff James also knew that he had sold eBooks of *Sorcerer's Drum*.

61.          Plaintiff James also sold his second book *Web of Freedom* to friends and family but received no royalties or sales reports for that book either.

62.          In a telephone conversation, iUniverse admitted to Plaintiff James that the company had numerous problems with reporting its sales statements and making royalty payments.

63.          In fact, in an email dated April 8, 2011, Plaintiff James's PSA informed him that iUniverse was "now working to fix the sales and royalties report" for Plaintiff James's book, promising to update Plaintiff James on Monday, April 11, 2011.  On Tuesday, April 12, 2011, Plaintiff James had still not heard anything from iUniverse and emailed his PSA again to inquire whether she had any information on his "sales records . . . that seemed to be lost."  Plaintiff James's PSA responded that Plaintiff James's agent, Christopher James (Plaintiff's son), would be able to view "the Sales and Royalties" report for his book.

64.          On January 23, 2012, Plaintiff James finally received a royalty payment for his *first* book, without any sales report, in the amount of $6.92.  The check indicated that the payment was for "Q2" 2011 royalties.  This was the only royalty check James ever received for

either of his works.

65.     James repeatedly contacted iUniverse Customer Support for an explanation with respect to his inexplicably small royalty payment.  On February 6, 2012, he received an email "apologiz[ing] for the inconvenience this may have caused you.  I understand that you need to be able to get these sales reports for your reference . . ."

66.     Upon receiving the check, James attempted to terminate his relationship with iUniverse but was unable to do so and was instead instructed on the proper procedure for contract termination.  James finally terminated his publishing agreement with iUniverse on March 21, 2012.  James's books are still available on Amazon for purchase on Kindle.

**Plaintiff Simmons' Allegations**

*Fraudulent Editorial Services*

67.     Plaintiff Simmons purchased a "Bookstore Premier Pro" package from iUniverse on or about May 31, 2011.  Plaintiff Simmons submitted her manuscript to iUniverse in or around January 2012.

68.     In or about February 2012, Plaintiff Simmons submitted her manuscript for an Editorial Evaluation ("Simmons Evaluation"), included as part of her publishing package.  That same month, she received an email from iUniverse's Editorial Department that provided Plaintiff Simmons the following canned response (emphasis added):

> Your manuscript has many of the basic elements required in today's publishing marketplace, *but it is the opinion of the Editorial Board that the Editor's Choice designation cannot be awarded without additional revision.* Editor's Choice is still a possibility if the editorial services recommended in the Editorial Rx Referral in your Editorial Evaluation are completed satisfactorily.

69.     No editorial board reviewed Plaintiff Simmons' manuscript.  Furthermore, no editorial board formed the opinion that additional revisions were necessary to award the Editor's

Choice designation.

70.       The Simmons Evaluation suggested that Simmons consider purchasing the Developmental Edit, as it would improve the quality of her book by "address[ing] grammatical errors," and "ensur[ing] that the manuscript is editorially sound before it goes into production." In or around May 2012, Simmons purchased a Developmental Edit for $4,659.78.  However, the Developmental edit did not address grammatical errors in her book and did not ensure that her manuscript was editorially sound before it went into production.

71.       On or around October 18, 2012, Plaintiff Simmons paid $1049 for a Proofreading Package that obligated Author Solutions to proofread Plaintiff Simmons' work at the production stage.  However, Author Solutions did not proofread Plaintiff Simmons' work at the production stage, as demonstrated by the fact that Plaintiff Simmons' work contained numerous errors, including typographical errors.

72.       Plaintiff Simmons paid an additional $450 in March 2013 to correct some of the errors that remained in her final manuscript despite the initial review.  She decided not to have all of the errors corrected, as Author Solutions' additional correction fees made doing so cost prohibitive.

*Fraudulent Marketing Services*

73.       On or around December 13, 2012, Plaintiff Simmons purchased a Marketing Package for her book in the amount of $13,600.  The Marketing Package included an author website, social media services, a radio interview, and a publicist for a three month marketing campaign.

74.       Author Solutions failed to deliver the marketing services that it promised.

75.       Although Plaintiff Simmons' book was published in December 2012, by February

2013, no work had begun on Plaintiff Simmons's marketing campaign.  Author Solutions had given Ms. Simmons the impression that they would begin to market the book soon after its December 2012 publication since it is important for a book marketing campaign to follow closely the book's publication.

76.	Plaintiff Simmons expressed her concern to Ben Hudson, an iUniverse representative, and requested a refund.  Hudson asked Plaintiff Simmons to be patient with iUniverse, since Penguin had recently purchased Author Solutions, and requested that she not terminate her contract.  On or about February 20, 2013, Hudson promised Plaintiff Simmons a YouTube advertising campaign in exchange for keeping Plaintiff Simmons in contract with iUniverse.  Hudson stated that the value of this service was $4,799.00.  As a result, Plaintiff Simmons decided not to terminate her Publishing Agreement.  She spent a week filling out information for the new services Hudson provided to her.  To date, Author Solutions has failed to deliver the YouTube advertising campaign.

77.	Author Solutions did not begin to market her book until the end of March 2013.

78.	However, Author Solutions failed to complete the social media elements of Plaintiff Simmons's campaign, such as creating an active Twitter account and a Facebook page.

79.	During the entirety of the three-month campaign, for which Plaintiff Simmons paid $13,600, Plaintiff Simmons earned only $50.00 in royalties.

*Failure to Properly Account for Royalties*

80.	Author Solutions has failed to report royalties for Plaintiff Simmons's work accurately.  For instance, Plaintiff Simmons's brother purchased her work from Amazon.com in hardcover in February or March 2013.  Author Solutions has failed to report this sale.  Plaintiff Simmons also received an email from another reader who had also bought a hardcover copy, but

Author Solutions has failed to report this sale as well.  Author Solutions has not reported any e-book sales, but Plaintiff Simmons is confident that she has sold e-book versions of her work as well.

81.        Plaintiff Simmons terminated her agreement with iUniverse in or around August 2013.

**Plaintiff Foster's Allegations**

*Fraudulent Editorial Services*

82.        In or around March 2010, Plaintiff Foster purchased the "Bookstore Premier Pro" package for $1,499.00 for the publication of her book *Forgotten Burial: A Restless Spirit's Plea for Justice*.  The package came with various services and made her eligible for iUniverse's Recognition Programs, such as Editor's Choice and Rising Star.  These Recognition Programs appealed to Plaintiff Foster.

83.        Plaintiff Foster purchased the package over the phone from iUniverse and accepted the Terms and Conditions over email shortly thereafter.

84.        Plaintiff Foster's "Bookstore Premier Pro" Publishing Agreement contains a clause regarding the "purchase of additional services," which states that "Terms and Conditions available on the iUniverse website at www.iuniverse.com/packages/BookstorePremierPro.aspx will take precedence for all services."  The "Terms and Conditions" available on the website are identical to Plaintiff Foster's Publishing Agreement, thus the purchase of additional services are bound by Plaintiff Foster's Publishing Agreement.

85.        On August 10, 2010, Plaintiff Foster submitted her manuscript for an Editorial Evaluation, included as part of her publishing package, which was completed on August 13, 2010 ("Foster Evaluation").   The Foster Evaluation was sent to her via email from iUniverse's

Editorial Department.  It provided Foster the following canned response (emphasis added):

> Your manuscript has many of the basic elements required in today's publishing marketplace, *but it is the opinion of the Editorial Board that the Editor's Choice designation cannot be awarded without additional revision.* Editor's Choice is still a possibility if the editorial services recommended in the Editorial Rx Referral in your Editorial Evaluation are completed satisfactorily.

86.        No editorial board reviewed Plaintiff Foster's manuscript.  Furthermore, no editorial board formed the opinion that additional revisions were necessary to award the Editor's Choice designation.

87.        The Foster Evaluation specifically recommended several services, such as a Developmental Edit and Cover Copy Polish, and required the purchase of these services in order for Foster to be considered for Editor's Choice.

88.        The Foster Evaluation claimed that the Developmental Edit would assist Foster "with structural work such as [point of view] and characterization."  In addition, the Foster Evaluation explained that the Developmental Edit also included a Content Edit to "address grammatical errors and dialogue attribution and formatting" and a Quality Review "to ensure that the manuscript is editorially sound before it goes into production."  Foster reasonable relied on these statements in deciding to purchase the Developmental Edit.

89.        However, the statements in the Foster Evaluation about the Developmental Edit were either untrue or misleading.  The Developmental Edit did not assist Foster with structural work such as point of view and characterization.  The Developmental Edit did not address grammatical errors and dialogue attribution and formatting.  The Developmental Edit did not ensure that her manuscript was editorially sound before it went into production.  Foster's book contained numerous and egregious publisher errors when published.

90.        Author Solutions knew or should have known that the Editorial Evaluation was

misleading and that the Developmental Edit would not sufficiently correct grammatical mistakes as promised, because its editors were either unskilled, untrained, or were not given sufficient time in which to complete this task. Additionally, Author Solutions had received numerous complaints from other authors about the quality of its editing services. Author Solutions did not disclose this information to Foster but instead led Foster to believe that her book would meet "professional editing standards" and would be ready for a competitive marketplace, or at a very minimum, that it would not contain glaring errors, particularly publisher errors, at the time of publication.

91.       On August 13, 2010, Foster also received a form email ("August 13 Email") from her Editorial Consultant, Kathi Wittkamper, stating that she had been "flagged as a possible Editor's Choice title." The August 13 Email encouraged Foster to purchase editing services, claiming that Author Solutions would provide Foster "a professional editor who is not only an expert in your genre, but is also drawn from the same pool of editors used in major traditional publishing. This editor will help you bring you manuscript up to the traditional publishing requirements and the evaluation requirements." Foster reasonably relied on the August 13 Email in deciding to purchase further editing services.

92.       The August 13 Email was either untrue or misleading in that it grossly exaggerated the level of editing that Author Solutions provided to Foster. Author Solutions knew or should have known that such statements were either untrue or misleading, because Author Solutions routinely failed to provide the level of services it promised to its authors. Author Solutions had received numerous complaints about the poor quality of its editing.

93.       In August and September of 2010, Wittkamper also strongly advised Foster to purchase the Developmental Edit in order to improve the quality and marketability of her book.

The statements over the phone were also either untrue or misleading in that they led Foster to believe that the editing services would improve the quality and marketability of her work, even though Author Solutions knew that this was not the case.

94.    Author Solutions also made untrue or misleading statements by failing to disclose to Foster that she would be required to purchase more services for participation in Rising Star.

95.    Foster was unable to acquire the money to purchase the Development Edit until early March 2011, at which time she paid for the service in full. She purchased the Development Edit on or about March 4, 2011.

96.    The Developmental Edit was completed on April 27, 2011, and on May 2, 2011, Foster was notified that her book had received the Editor's Choice designation.    iUniverse refused to provide any information as to the names, backgrounds, or qualifications of the Review Board, or even how many people sat on the board.

97.    The final copy of Foster's book contained several publisher errors, such as odd formatting of paragraphs and grammar mistakes, whereby a comma should have been a period. In other words, while the Developmental Edit promised to correct such mistakes, it failed to do so and merely delayed the publication of her work. Foster was unable to obtain a refund for the Developmental Edit.

*Fraudulent Marketing Services*

98.    On June 2, 2011, Foster was informed that she had also received the Rising Star designation.

99.    In a June 21, 2011 email, the Rising Star Board indicated that "[i]f you purchased marketing services or your marketing plan was based on services offered by iUniverse and you decide to cancel or do not purchase mentioned services indicated in your Rising Star Marketing

Survey or to your Marketing Consultant, the Rising Star distinction will be removed from your title."   This email was the first time Foster was made aware of additional requirements to participate in the Rising Star program.

100.        Foster's Marketing Consultant confirmed that she was required to purchase a Marketing Package, and Foster purchased a marketing package for $3,999.00, since she did not wish to lose her Rising Star designation and she wanted to market her book aggressively.   Foster was then assigned a "publicist" who subcontracted with iUniverse.   iUniverse failed to deliver the services promised in the marketing package and ultimately fully refunded Foster for the marketing package.

*Failure to Properly Account for Royalties*

101.        Once Foster's work reached the marketplace, iUniverse failed to correctly report royalties.   For instance, iUniverse incorrectly reported the number of books Barnes & Noble purchased for her book signing.   When Foster called iUniverse to complain, iUniverse simply stated that they did not know why the report was incorrect.   Each phone call to iUniverse took significant time.

102.        Foster demanded a refund of all of the monies she paid to Author Solutions, which she did not receive.   She terminated her agreement with iUniverse in or about June 2012. All told, Foster paid iUniverse $5,695.25.

## IV. CLASS ACTION ALLEGATIONS

103.        Plaintiffs bring this action as a class action pursuant to Rule 23(a), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves individually and all others similarly situated who have purchased Publishing Packages and/or Services from Defendants (the "Class"), who have not been paid royalties, or whose Services have not been

fulfilled since April 26, 2007 (the "Class Period").

104.        Excluded from the class are Defendants, Defendants' employees and any entity in which the Defendants have a controlling interest, and their legal representatives, officers, directors, assignees and successors.

105.        Plaintiffs also bring this action on behalf of three subclasses of all people who have purchased Publishing Packages and/or Services in conjunction with their literary work(s) and are residents of California ,New York, and Colorado.

### Subclasses

**California:** All persons residing in California who purchased a Publishing Package and/or Services from Defendants in conjunction with their literary work(s), who have not been paid royalties, or whose Services have not been fulfilled since April 26, 2009.

**New York:** All persons residing in New York who purchased a Publishing Package and/or Services from Defendants in conjunction with their literary work(s), who have not been paid royalties, or whose Services have not been fulfilled since April 26, 2010.

**Colorado:** All persons residing in Colorado who purchased a Publishing Package and/or Services from Defendants in conjunction with their literary work(s), who have not been paid royalties, or whose Services have not been fulfilled since September 27, 2010.

106.        **Numerosity/Impracticability of Joinder**: The members of the Class are so numerous that joinder of all members would be impracticable.  In 2011 alone, Defendants sold 27,500 Publishing Packages to authors.   The precise number of Class members can be ascertained by reviewing documents in Defendants' possession, custody, and control.

107.        **Commonality and Predominance**: There are common questions of law and fact which predominate over any questions affecting only individual members of the Class and/or the Subclasses.   These common legal and factual questions include, but are not limited to, the

following:

    (a)    Whether Defendants misled Plaintiffs and the Class;

    (b)    Whether Defendants' representations of its Publishing Packages or Services have the capacity, tendency, or effect of deceiving or misleading consumers;

    (c)    Whether Defendants' representations relating to its Publishing Packages or Services suggest a sponsorship, approval, status, affiliation, or connection which it does not have;

    (d)    Whether Plaintiffs and the Class were injured as a result of Defendants' deceptive conduct;

(e)    Whether Plaintiffs and the Class have conferred a benefit upon Defendants;

(f)    Whether it is inequitable for Defendants to retain payment for services that it misrepresented or failed to carry out;

(g)    Whether, as a result of Defendants' conduct, Plaintiffs and the Class have suffered damages; and if so the appropriate amount;

    (i)    Whether Defendants acted in such a manner as to prevent Plaintiffs and members of the Class from receiving the benefits of their contracts;

    (j)    Whether Defendants have failed to pay Plaintiffs and members of the Class their earned royalties in breach of their Publishing Agreement;

    (k)    Whether Defendants' conduct violated the California Unfair Competition Law;

    (l)    Whether Defendants' conduct violated the California Business and Professions Code;

    (m)    Whether Defendants' conduct violated the New York General Business Law; and

    (n)    Whether Defendants' conduct violated the Colorado Consumer Protection Act.

108.    **Typicality**: The Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all Class members have been injured by the same wrongful practices in which Defendants have engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of all Class members and are based on the same legal

theories.

109.        **Adequacy**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflicting with the Class.

110.        **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.  The individual damages incurred by each Class member resulting from Defendants' wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, Defendants have acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

111.        Plaintiffs and the Class do not anticipate any difficulty in the management of this litigation.

**COUNT ONE**
**BREACH OF CONTRACT**

112.        Plaintiffs repeat and reallege the allegations set forth herein and further allege:

113.        Plaintiffs and the other members of the Class all purchased Publishing Packages and/or other Services from Defendants during the Class Period.

114.        At all material times, Defendants have made representations on their website, Publishing Agreements, email correspondence with its authors, other written materials, and through telephone communications, falsely claiming that it would pay its authors royalties per the terms of their Publishing Agreements.

115.        The material contract terms outlining royalties for Plaintiffs and members of the Class are as follows:

a.        Defendants would make four royalty payments per year if the author earned a certain dollar amount in royalties.  If the author did not, Defendants would apply the balance to the following quarter.

b.        Defendants would pay the author either 10% or 20% "of the payments PUBLISHER actually receives from sales of printed copies of the WORK, less any taxes, shipping charges and returns unless AUTHOR has purchased the Booksellers Return Program."  Authors receive an extra 5% if sales were made through Barnes & Noble.

c.        Authors would receive 50% of the payments Defendants "actually [receive] from the sales of eBook copies of the WORK, less any distribution and technology fees, taxes and returns."

116.        Defendants have breached their contract with Plaintiffs and members of the Class in at least the following respects:

a.        failing to pay Plaintiffs and members of the Class their earned royalties and failing to

27

provide authors accurate sales statement;

b.       failing to fulfill Services sold to members of the Class; and

c.       failing to render Editorial Services by "publishing professionals."

117.       As a direct and proximate result of Defendants' aforementioned breaches, Plaintiffs and members of the Class have suffered damages.

## COUNT TWO
## UNJUST ENRICHMENT

118.       Plaintiffs repeat and reallege the allegations set forth herein and further allege:

119.       To the extent Plaintiff James, Plaintiff Simmons, and Plaintiff Foster and members of the Class have purchased Publishing Packages and/or Services for which no contract was provided, Defendants have been unjustly enriched.

120.       Plaintiffs and the Class have conferred a benefit upon Defendants in the form of earned royalties that Defendants have failed to pay, or in the form of payment for one or more of the Services Defendants sold and failed to provide either in whole or in part.

121.       Defendants have also retained payments from Plaintiffs and members of the Class for Services that were not fulfilled properly relating to the publication, production or promotion of their books.

122.       Defendants created the expectation that they would provide diligent service, pay royalties, and execute Services professionally to Plaintiffs and members of the Class.

123.       Instead, Defendants have benefitted from failing to provide diligent and careful service to Plaintiffs and members of the Class.  The books are not properly edited, even after the purchase of expensive editing services, and Services are not fulfilled.  Defendants also fail to pay royalties and provide accurate royalty statements.

124.       Defendants have further benefitted by continuing to sell books online, even after

Plaintiff and members of the Class have terminated their Publishing Agreement with Defendants.

125.        It is inequitable for Defendants to retain royalties earned and due to Plaintiffs and members of the Class, to retain monies for books sold after contracts terminated, and to retain payment for Services that Defendants failed to carry out as promised.

**COUNT THREE**
**CALIFORNIA BUSINESS AND PROFESSIONS CODE**
**(CAL. BUS. & PROF. CODE § 17500, ET SEQ. – Untrue Advertising)**
(California Subclass)

126.        Foster repeats and realleges the allegations set forth herein and further alleges:

127.        Foster asserts this cause of action for violations of California Business and Professions Code § 17500, *et seq.,* for untrue advertising against Defendants.

128.        At all material times, as stated in more detail above, Defendants made false, untrue, or misleading statements, including but not limited to statements about inflated sales figures, quality of published works, and quality of Services to induce authors to purchase Publishing Packages and Services from Author Solutions.

129.        Defendants have made these representations on their website, email correspondence with its authors, other written materials, and through telephone communications with Foster and members of the California Class.

130.        Defendants falsely claimed or conveyed the impression of the following:

a.        that Defendants would create a professionally published and marketable work that was "primed for retail success";

b.        that publishing and marketing Services would be rendered by professionals and that such Services would improve the quality and marketability of the authors' work(s);

c.        that Services would enhance an author's reputation or increase book sales; and

d.      that Services for marketing campaigns would be provided for the duration of the time allotted for the campaign.

131.      As a result of Defendants' false advertising, Foster and members of the California Class suffered economic injury in that they lost money or property by paying for Services that were never delivered.

132.      The economic injury suffered by Foster and members of the California Class was caused by their reliance on Defendants' false advertising, as Foster and members of the California Class reasonably relied on Defendants' advertising in purchasing Services that were never delivered and/or Services that were not executed as promised.

133.      Defendants knew or by the exercise of reasonable care should have known that the statements regarding the effectiveness of publishing, editing, and marketing Services, and who was rendering such Services, were untrue or misleading.  Statements made by Defendants were not mere puffery.

134.      Consumers, including Foster and members of the California Class, necessarily and reasonably relied on Defendants' statements.

135.      Consumers, including Foster and members of the California Class, were among the intended targets of these representations and statements.

136.      The above acts of Defendants, in disseminating said misleading and deceptive representations and statements throughout the State of California to consumers, including to Foster and members of the California Class, were and are likely to deceive reasonable consumers by obfuscating the nature of Defendants' business practices, all in violation of the "untrue" prong of California Business and Professions Code § 17500, *et seq.*

137.      Foster and members of the California Class, pursuant to California Business and

Professions Code § 17535, are entitled to an order of this Court enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore to any person in interest any money paid to Defendants as a result of its deceptive marketing scheme.

**COUNT FOUR**
**CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET SEQ. – Unlawful Business Acts and Practices)**
(California Subclass)

138.    Foster repeats and realleges the allegations set forth herein and further alleges:

139.    Such acts of Defendants, as described herein, and each of them, constitute unlawful business acts and practices.

140.    The business practices alleged above are unlawful under Business and Professions Code § 17200, *et seq.* ("UCL") by virtue of violating Business and Professions Code § 17500, *et seq.*, which forbids untrue advertising and misleading advertising.

141.    Defendants have engaged in the following unlawful acts:

a.    Falsely claiming or conveying the impression to Foster and members of the California Class that Author Solutions would create professionally published books "primed for retail success";

b.    Selling publishing and editing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such Services would be rendered by professionals and that such Services would improve the quality and marketability of the authors' work(s);

c.    Selling marketing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such Services would enhance an author's reputation or increase book sales; and

d.      Selling marketing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such Services would be provided for the duration of the time allotted for the campaign.

142.        As a result of the wrongful business practices described above, Foster and members of the California Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendants and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for the products as a result of the wrongful conduct alleged herein.

143.        Plaintiffs and other members of the California Class have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL.

144.        Plaintiffs and members of the California Class have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL.

145.        As a result of Defendants' violations of the UCL, Plaintiff and members of the California Class are also entitled to attorneys' fees and costs to be paid by Defendants, as provided by California Code of Civil Procedure § 1021.5 and other applicable law.

**COUNT FIVE**
**CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET SEQ. – Unfair Business Acts and Practices)**
(California Subclass)

146.        Foster repeats and realleges the allegations set forth herein and further alleges:

147.        Such acts of Defendants, as described herein, and each of them, constitute unfair business acts and practices.

148.        Foster, and other members of the California Class, suffered a substantial injury by purchasing Publishing Packages and/or publishing or marketing Services from Defendants that

they would not have bought absent Defendants' unfair advertising.

149.      The business practices alleged above have hurt the general public.

150.      Defendants' conduct harms competition and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

151.      Defendants aggressively lure authors into purchasing expensive Publishing Packages and/or Services with false promises with respect to sales figures and quality of Services.  These books could otherwise have been published through vanity presses or other self-publishing companies.

152.      Defendants also profit from delaying publication of books to sell authors more services and by either failing to correct or making new errors in books that can be fixed only for a fee.

153.      There is no benefit to consumers or competition by falsely advertising the value of its Publishing Packages or quality of Services and by failing to disclose the true nature of its business.   Indeed, the harm to the consumers and competition is substantial and greatly outweighs any benefits that the conduct may have.

154.      As a result of the business acts and practices described above, Foster and members of the California Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for Defendants' services as a result of the wrongful conduct of Defendants.

155.      Plaintiffs and members of the California Class have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL.

156.          As a result of Defendants' violations of the UCL, Plaintiff and members of the California Class are also entitled to attorneys' fees and costs to be paid by Defendants, as provided by California Code of Civil Procedure § 1021.5 and other applicable law.

**COUNT SIX**
**CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200, ET SEQ. – Fraudulent Business Acts and Practices)**
(California Subclass)

157.          Foster repeats and realleges the allegations set forth herein and further alleges:

158.          Such acts of Defendants as described herein, and each of them, constitute fraudulent business practices under California Business and Professions Code § 17200, *et seq.*

159.          A fraudulent act is an act in which members of the public are likely to be deceived.  The business practices alleged herein and Defendants' false advertising made it probable that a significant portion of the general consuming public could be misled.

160.          As more fully described herein, Defendants deceived the general public and lured authors into purchasing expensive Publishing Packages and Services by doing the following:

a.          Falsely claiming or conveying the impression to Foster and members of the California Class that Author Solutions would create professionally published books "primed for retail success";

b.          Selling publishing and editing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such Services would be rendered by professionals and that such Services would improve the quality and marketability of the authors' work(s);

c.          Selling publishing and editing Services to Foster and members of the California Class by baiting them with a potential Editor's Choice or Rising Star designation ("Recognition Programs"), and by failing to disclose relevant information, such as the type, quantity, and price

of subsequent services Foster and members of the California Class would be required to purchase to receive such status;

d.      Selling marketing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such Services would enhance an author's reputation or increase book sales; and

e.      Selling marketing Services to Foster and members of the California Class by falsely claiming or conveying the impression that such Services would be provided for the duration of the time allotted for the campaign.

161.      Said acts are fraudulent business acts and practices.

162.      As a result of these fraudulent business acts and practices, Foster and members of the California Class were misled into purchasing expensive Publishing Packages and/or paying for Services that were never delivered.

163.      As a result of the business acts and practices described herein, Foster and members of the California Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future wrongful conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any person in interest any money paid for the services at issue as a result of the wrongful conduct of Defendants.

164.      Plaintiffs and members of the California Class have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL.

165.      As a result of Defendants' violations of the UCL, Plaintiff and members of the California Class are also entitled to attorneys' fees and costs to be paid by Defendants, as provided by California Code of Civil Procedure § 1021.5 and other applicable law.

**COUNT SEVEN**
**NEW YORK GENERAL BUSINESS LAW: DECEPTIVE ACTS AND PRACTICES**
**(N.Y. GBS. LAW § 349)**
(New York Subclass)

166.     James repeats and realleges the allegations set forth herein and further alleges:

167.     NY GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

168.     As alleged herein, Defendants engaged in deceptive acts and practices that affect consumers at large and violated NY GBL § 349(a).

169.     Defendants' conduct was consumer oriented in that James and the New York Class are "persons" within the meaning of NY GBL § 349(h).

170.     At all material times, Defendants' representations on its website, its publishing contract, its email correspondence with its authors and other materials falsely claim or convey the false impression that Defendants are an independent publisher in the business of creating quality books, giving authors more control over their work and higher royalty percentages, and generating marketing opportunities for its consumers.  But this is not the case.

171.     James and other members of the New York Class were deceived into purchasing expensive Publishing Packages and/or other Services from a company who profits not by creating quality books and generating significant book sales to a general readership, but from operating as a print-on-demand vanity press that profits from delaying publication, publishing manuscripts with errors to generate fees, failing to deliver services for which authors pay, or providing services that fail to accomplish what Author Solutions promises.

172.     Defendants fail to take the basic care of a publisher, such as ensuring proper formatting, eliminating publisher errors and glaring typographical mistakes, and paying its

authors earned royalties.

173.         Defendants' unfair and deceptive trade acts have caused damages and injury to James and the New York Class.

**COUNT EIGHT**
**COLORADO CONSUMER PROTECTION ACT: DECEPTIVE TRADE PRACTICES**
**(Colo. Rev. Stat. Sec. 6-1-105(1)(u)**
(Colorado Subclass)

174.         Simmons repeats and realleges the allegations set forth herein and further alleges:

175.         Colo. Rev. Stat. Sec. 6-1-105(1)(u) states: "A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."

176.         As alleged herein, Defendants engaged in deceptive acts and practices that violated Colo. Rev. Stat. Sec. 6-1-105(1)(u).

177.         Defendants knowingly made false representations as to the characteristics and benefits of their editorial and marketing services, and their royalties' payment structure.  In so doing Defendants failed to disclose material information known at the time of their sale of those services with the intent to induce the sale.

178.         Defendants' practice occurred in the course of their business.

179.         Defendants' practice significantly impacts the public as actual or potential consumers of their goods.

180.         Simmons, and other members of the Colorado Class, suffered a substantial injury by purchasing Publishing Packages and/or publishing or marketing Services from Defendants that they would not have bought absent Defendants' unfair advertising.

181.        Defendants' deceptive trade practice was the cause of that injury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and the other members of the Class, respectfully pray:

A.        That the Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action be given to the class;

B.    That the Court order Defendants to release the publication rights of Plaintiffs and all Class members who so desire;

C.        That the Court award the Plaintiffs and the Class compensatory damages believed to exceed $5,000,000, including any additional monies paid by Class members for the purchase of any services sold by Defendants that were not delivered, either in whole or in part;

D.        That Plaintiffs and the Class recover damages determined to have been sustained by them, and that judgment be entered against Defendants in favor of the Class;

E.        That Plaintiffs and the class recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorney fees as provided by law;

F.        That Defendants be ordered to pay restitution to Plaintiffs and the Class; and

G.        That Plaintiffs and the Class be granted such other, further relief as may be determined to be just, equitable and proper by this Court, including but not limited to punitive damages and that the Court order such other and further relief as the Court deems just, necessary, and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all causes of action so triable.


Dated: New York, New York
         September 27, 2013

                                    _____/s/ Oren Giskan_____
                                    Oren Giskan
                                    O. Iliana Konidaris
                                    Raymond Audain
                                    GISKAN SOLOTAROFF ANDERSON &
                                     STEWART LLP
                                    11 Broadway, Suite 2150
                                    New York, NY 10004
                                    Telephone:  (212) 847-8315
                                    ogiskan@gslawny.com
                                    ikonidaris@gslawny.com