UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
MARY SIMMONS and JODI FOSTER, on       :
behalf of themselves and all others    :
similarly situated,                    :
                                       :
                    Plaintiffs,        :        13cv2801 (DLC)
                                       :
        -v-                            :        OPINION & ORDER*
                                       :
AUTHOR SOLUTIONS, LLC,                 :
                                       :
                    Defendant.         :
                                       :
-------------------------------------- X

APPEARANCES

For plaintiffs:

Oren Giskan
O. Iliana Konidaris
Raymond Audain
GISKAN SOLOTAROFF ANDERSON & STEWART LLP
11 Broadway, Suite 2150
New York, NY 10004

For defendant Author Solutions, LLC:

Jonathan M. Herman
Christopher G. Karagheuzoff
Jonathan Montcalm
Dai Wai Chin Feman
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019

---

* The Clerk of Court is respectfully directed to amend the
official caption in this case to conform to the caption above.

1

DENISE COTE, District Judge:

On February 13, 2015, Mary Simmons ("Simmons"), Jodi Foster ("Foster"), and members of the putative class (collectively, "plaintiffs") filed a motion for class certification.  The motion was fully submitted on May 14, when defendant Author Solutions, LLC ("AS"), with the Court's permission, filed a sur-reply.  For the following reasons, the motion is denied.

BACKGROUND

The background of this action is described in an Opinion ruling on a motion to dismiss.  See James v. Penguin Grp. (USA) ("MTD Op."), No. 13cv2801 (DLC), 2014 WL 1407697, at *1-4 (S.D.N.Y. Apr. 11, 2014).  Familiarity with that Opinion is presumed.  The following facts are drawn from the parties' evidentiary submissions on this class certification motion.

I.   Factual Background

AS is a "supported self-publishing" company that sells services to authors who desire to self-publish.  AS offers a variety of services, which can be separated into three primary categories: publishing, editorial, and marketing.  These services are sold to authors by AS's salesforce, made up of Publishing Consultants, Editorial Consultants, and Marketing

Consultants.[1]  AS operates through various branded imprints, which it either owns or manages and operates primarily through partnerships with traditional publishers.  Over the course of the relevant class period, AS offered services through a total of sixteen imprints.

Many of the imprints are designed to appeal to authors with different motivations.  Some authors choose to publish with AS because they could not secure a traditional publishing deal; others want a book to give to family members.  Some hope to get picked up by a traditional publisher or even aspire to become the next best-selling author, while others simply want to see their names in print on their bookshelves.

AS markets its services to authors primarily online through its various imprints' websites.  Authors initiate contact with AS, typically by completing a form on an imprint's website, thus becoming a "lead" for that imprint.  Publishing Consultants first contact authors after they have become a lead for the imprint.  Editorial Consultants and Marketing Consultants contact the authors at later stages of the publishing process.

---

[1] Plaintiffs purport to find deceit in AS's use of the label "consultant" for its salespersons, claiming that the title implies certain relevant experience or skill in its bearer. Plaintiffs adduce no class-wide evidence, however, that the label deceived authors.

AS's salesforce often makes contact by telephone, and sales of AS services are made almost exclusively by telephone, typically after multiple calls.  The consultants are trained to engage authors in dialogue to discern their individual publishing goals and needs.  Because these goals and needs vary by author, no sales script is used during sales calls.  If these sales calls result in a sale, the author and AS enter into a contractual agreement.  The services that AS offers and the service agreements through which they are delivered vary across the AS imprints, as do the websites and representations used to advertise those services.

One of the imprints that AS owns, and the only imprint at issue here, is iUniverse.[2]  Through iUniverse, AS offers five publishing packages.  Listed in ascending order of services provided and price, they are: Select, Premier, Premier Pro, Bookstore Premier Pro, and Book Launch Premier.  The iUniverse website lists sixteen categories of marketing services.  Most of them can be purchased on a standalone basis or as part of a package.  Typically, each of the packages and services has its own webpage describing its components.

---

[2] Plaintiffs narrowed their putative class to authors with iUniverse contracts because those contracts do not contain venue clauses; other imprints' contracts include venue clauses selecting Indiana, the state in which AS is based.

iUniverse offers three recognition programs -- Editor's Choice, Rising Star, and Star -- the first two of which are unique to iUniverse and provide part of the incentive for authors to publish with iUniverse.  Earning the Editor's Choice designation is a prerequisite to earning the Rising Star designation, which is geared toward rewarding and recognizing books with high marketing potential.

Plaintiffs' application for certification of a class currently rests on three representations on AS's websites about its marketing programs.[3]  iUniverse's homepage includes the following blurb:

**Get primed for retail success**

In a recent industry study, iUniverse **sold twice as many books** in the retail channel as other leading self-publishing companies.  The entryway for many iUniverse bestsellers is through our recognition programs.

Similarly, iUniverse's marketing and publicity services webpage states:

If you want your book to sell, you'll want to do more than just hope for the best.  Our selection of promotional products and services allows authors to build a dynamic platform from which they can effectively promote and sell their books.  Create your marketing plan and materials with our simple step-by-

---

[3] When this action was filed, the claims concerned, among other things, the quality of AS's editorial services and its payment of royalties.  Plaintiffs are not pursuing those theories of liability in seeking class certification.

step tools.

. . .

iUniverse offers four distinct review services to help
you elevate your book's credibility and raise its
marketing potential.

. . .

iUniverse can make your voice available to the
airwaves to help you reach new audiences and further
your cause.

iUniverse brings its authors together by genre to
promote their books directly to their target readers
in an effective, affordable co-op style.

. . .

[W]e've put our books in the hands of book lovers and
industry insiders through iUniverse book exhibition
services.

Finally, another iUniverse webpage proclaims:

The key to getting read, is getting book sales.  At
iUniverse, we're committed to helping you reach your
book sales goals.  No other self publishing company
offers more support or services to help you in this
process.

In addition to these three statements on which plaintiffs

principally rely, AS made several other statements related to

its marketing program.  AS made disclaimers that it did not

guarantee book sales, and reinforced the message that marketing

has much to do with the author's own efforts.  For instance,

iUniverse's online marketing tips webpage states that "the most

crucial piece to your book's online marketing plan is you."

6

Following that observation, the online marketing tips webpage
advertises that "[i]f you need a little help . . . then
iUniverse can make it happen.  Contact your marketing consultant
today on [telephone number]."

Moving from the general to the specific, according to the
website of the Bookstore Premier Pro package, purchased by both
of the named plaintiffs, it offers services that are

> a great choice for authors who want to present their
> professional product to the marketplace or who want to
> make their book a serious contender in today's
> competitive publishing environment. . . .  The
> Bookstore Premier Pro publishing package is focused on
> enhancing your chances of success with major
> bookselling chains such as Barnes and Noble.

The webpage for iUniverse's recognition programs invites
authors to "[a]mp up your opportunity for retail success,"
explaining that the recognition programs "open the door to more
opportunities for retail presentation and placement."  And the
Rising Star webpage touts that the designation "provides authors
with enhanced opportunities for exposure on local, regional and
national levels."  The webpage goes on to explain that Rising
Star books "are presented to major retailers, such as Barnes &
Noble, Books-A-Million and Borders."  The Rising Star program
simply entails AS shipping books and a sell-sheet to Barnes &
Noble's press department.

According to the deposition testimony of the Global

7

Director of Author Marketing Services at AS, book sales is "not one of the goals of [AS's] marketing services."  In fact, she said, "[I]t would be unrealistic for us to think that we could market our author's books.  Assisted self-publishing is marketing -- assisted marketing."  AS employs no salesperson to sell authors' books to the general public through the retail channel.  The salespeople it does employ are not required to have marketing or publishing experience, and they focus their efforts on selling AS products to authors.

Foster purchased a Bookstore Premier Pro package in March 2010.  The package included various services and made her eligible for Editor's Choice and Rising Star.  Foster received the Rising Star designation.  She asserts that she later purchased marketing services because she was told that if she did not, she would lose her Rising Star designation.

Simmons purchased a Bookstore Premier Pro package in May 2011.  On or around December 13, 2012, Simmons also purchased marketing services.

II.  Procedural Background

On April 24, 2013, Kelvin James ("James"), Terry Hardy ("Hardy"), and Foster filed, on behalf of themselves and all others similarly situated, a complaint naming as defendants Penguin Group (USA) Inc. ("Penguin"), which is AS's parent

8

corporation, and AS.  In response to a motion to dismiss, on July 19 the plaintiffs filed an amended complaint.  The defendants again moved to dismiss.  In a September 5 Order, the plaintiffs were given one final opportunity to amend their pleadings.

On September 27, the plaintiffs filed a second amended complaint ("SAC") that removed Hardy as a class representative and added Simmons as a new class representative.  The SAC, which is the operative complaint in this action, included eight claims.  The first alleged breach of contract for failure to pay royalties at the promised rate.  The second alleged unjust enrichment for retention of royalties and for receipt of money without providing promised services.  The third, fourth, fifth, and sixth claims alleged consumer fraud and false advertising under California's Unfair Competition Law ("UCL") and Fair Advertising Law ("FAL").  Cal. Bus. & Prof. Code §§ 17200, 17500.  The seventh claim alleged consumer deception under New York law.  N.Y. Gen. Bus. L. § 349.  And the eighth claim alleged fraudulent omissions under the Colorado Consumer Protection Act ("CCPA").  Colo. Rev. Stat. § 6-1-105(1)(u).

The defendants moved to dismiss the SAC, and, on April 11, 2014, the motion was granted in part:  Penguin was dismissed as a defendant from the action and the unjust enrichment claim

against AS based on unpaid royalties was also dismissed.  MTD
Op., 2014 WL 1407697, at *12.  On January 12, 2015, James
withdrew as a plaintiff.  With James's withdrawal, there is no
named plaintiff residing in New York.  Since Foster is a
resident of California and Simmons is a resident of Colorado,
this action now arises solely from statutory and common law
claims under the laws of California and Colorado, as well as the
breach of contract claim.  All discovery in this action was
completed by January 22, 2015.

## DISCUSSION

Plaintiffs move to certify a class to bring claims for
alleged misrepresentations by AS about the marketing services
offered by iUniverse.  In their reply brief they appear to
define the class as all persons who, during the period September
1, 2007 through the present, purchased marketing services from
iUniverse in conjunction with their written work(s), including
through the purchase of a Premier, Premier Pro, Bookstore
Premier Pro, or Book Launch Premier package.[4]  According to

---

[4] In response to arguments made in AS's opposition brief,
plaintiffs used their reply brief to redefine the class and
subclasses.  It was in part because of this shift that AS was
granted leave to file a sur-reply.  As there has been at least
one round of adversarial briefing on the class definitions set
forth in plaintiffs' reply, those are the definitions that are
analyzed here.

On May 21, 2015, plaintiffs requested that the majority of

plaintiffs, each of these packages included Editor's Choice, Rising Star, or Star eligibility.

Plaintiffs seek to certify two subclasses, one for California residents with a class period running from April 24, 2009, and one for Colorado residents with a class period from September 27, 2010.[5]  It is a "basic requirement that at least one <u>named</u> plaintiff must have standing to pursue each claim alleged."  <u>In re Salomon Analyst Level 3 Litig.</u>, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) (Lynch, J.); <u>see also</u> <u>Comer v. Cisneros</u>, 37 F.3d 775, 788 (2d Cir. 1994) ("[O]ne named plaintiff need have standing with respect to each claim.").  Foster has standing to pursue the California claims, and Simmons has standing to pursue the Colorado claims.[6]

---

AS's sur-reply be stricken, or alternatively that they be given leave to file a sur-sur-reply, contending that several sections of AS's sur-reply do not respond to the new arguments in plaintiffs' reply brief, which was the purpose for which the sur-reply was permitted.  Plaintiffs' May 21 request is denied.  AS's sur-reply was, in fact, directed to that which shifted between plaintiffs' opening and reply briefs.

[5] Plaintiffs do not explain why the class period runs from September 1, 2007, but the earliest subclass period runs from April 24, 2009.

[6] Plaintiffs explain in their reply brief that a third purported subclass, which they label the "Premier Publishing Package" or "PPP" subclass, brings claims under the UCL and CCPA.  They do not explain, however, how the PPP subclass would differ from their California and Colorado subclasses.  Consequently, the proposed subclasses as described above shall serve as the subjects of analysis here.

As discussed in more detail below, a substantial portion of plaintiffs' motion can be denied without resort to the strictures of Fed. R. Civ. P. 23.  Plaintiffs do not seek to certify their breach of contract claim, and, as discussed below, the unjust enrichment claim cannot be certified, because it is precluded by the existence of an agreement.  Additionally, the CCPA claim cannot be certified as requested here, because the statute does not permit money damages claims in class actions.  Because the Colorado subclass would bring only the unjust enrichment claim and the CCPA claim, neither of which can be certified, and because plaintiffs have no further opportunity to amend, a Colorado subclass may not be certified.

All that remains for Rule 23 analysis, then, is the California subclass.[7]  That analysis follows more detailed discussion of the above rulings.

I.   Unjust Enrichment Claim

One of the claims on which plaintiffs seek certification is their claim that AS was unjustly enriched by retaining payments for marketing services that were not provided.  Plaintiffs have

_____

[7] It is not clear from the parties' submissions how many authors had contracts with iUniverse during the relevant period or precisely how many plaintiffs would constitute the California subclass.  AS's opposition brief, however, notes that "the California Subclass encompasses thousands of authors."

12

limited the putative class to only those authors with iUniverse contracts, which, by their terms, are governed by Indiana law.

Under Indiana law, "[w]hen the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law," such as unjust enrichment.[8]  Zoeller v. E. Chi. Second Century, Inc., 904 N.E.2d 213, 221 (Ind. 2009).

> Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by reference as a part of the contract and, therefore, may properly be considered in the construction of the contract.  Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties.

MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc., 785 N.E.2d 632, 639 (Ind. Ct. App.), transfer granted, opinion vacated sub nom. MPACT Const. Grp. v. Superior Concrete Constructors, Inc., 804 N.E.2d 746 (Ind. 2003), and aff'd, 802

---

[8] Plaintiffs do not specify the jurisdiction under whose law they assert the unjust enrichment claim, but it is universally recognized that "[a] valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."  Restatement (Third) of Restitution and Unjust Enrichment § 2(2).  As this is a diversity case, New York's choice of law rules apply.  Chau v. Lewis, 771 F.3d 118, 126 (2d Cir. 2014).  And "New York choice-of-law rules . . . require the court to honor the parties' choice of law provision insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated."  Bank of New York v. Yugoimport, 745 F.3d 599, 609 (2d Cir. 2014) (citation omitted).  Here, the contract chooses Indiana law.

N.E.2d 901 (Ind. 2004).

Here, the iUniverse contracts provide that "[i]n the event AUTHOR purchases additional services . . . than those described in this Agreement, the Terms and Conditions available on the iUniverse website at [web address] will take precedence."  In other words, any marketing services that plaintiffs claim were not fulfilled properly would have been covered by an iUniverse contract, either standing alone or in conjunction with the terms and conditions on the iUniverse website.  In the face of such contractual terms and conditions, plaintiffs' unjust enrichment claim cannot be certified.

II.  CCPA Claim

As relief for the alleged CCPA violation, plaintiffs seek monetary damages.  But the CCPA does not permit monetary damages in class actions.  Pursuant to the CCPA:

> Except in a class action . . . , any person who . . .
> is found to have engaged in . . . any deceptive trade
> practice . . . shall be liable in an amount equal
> to . . . [t]he greater of:
>
> > (I) The amount of actual damages sustained; or
> >
> > (II) Five hundred dollars; or
> >
> > (III) Three times the amount of actual damages
> > sustained, if it is established by clear and
> > convincing evidence that such person engaged in
> > bad faith conduct . . . .

Colo. Rev. Stat. § 6-1-113(2)(a) (emphasis added).  The Colorado

14

Supreme Court has not spoken on the issue, but, as noted by a
federal district court in Colorado in Martinez v. Nash Finch
Co., "[t]he plain and unambiguous language of the statute
compels the conclusion that all of the remedies in subparts
(a)(I)-(III) . . . , including actual damages, are not available
to classes."  886 F. Supp. 2d 1212, 1218 (D. Colo. 2012); see
also Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc., No.
13cv1803 (EMC), 2014 WL 1048710, at *10 (N.D. Cal. Mar. 14,
2014) (dismissing CCPA claim "to the extent it seeks to assert a
class action for monetary relief").

Against this conclusion, plaintiffs cite a number of
unhelpful cases.  They rely most heavily on Robinson v. Lynmar
Racquet Club, Inc., 851 P.2d 274 (Colo. App. 1993).  As the
Martinez court noted, however, Robinson involved a prior version
of the CCPA that did not expressly preclude actual damages in
class actions, as the current version, enacted in 1999, does.
See Martinez, 886 F. Supp. 2d at 1219; see also 1999 Colo.
Legis. Serv. Ch. 188 (S.B. 99-143).  At the time Robinson was
decided, Section 6-1-113(2)(a) provided,

> Except in a class action, any person who . . . is
> found to have engaged in any deceptive trade practice
> shall be liable in an amount equal to . . . [t]hree
> times the amount of actual damages sustained or two
> hundred fifty dollars, whichever is greater . . . .

Robinson, 851 P.2d at 278 (citation omitted).  Robinson held

that class action members could not "benefit[] from damages provided in subparagraph[] (2)(a)." <u>Id.</u>  As the court explained, "[A]lthough an individual plaintiff may be awarded $250 under the provision without proof of actual damages, class action members may not."  <u>Id.</u>

Plaintiffs cite <u>Robinson</u> because, in dicta, the court observed that "the statute does not preclude class members from bringing an action for actual damages."  <u>Id.</u>  The current version of Section 6-1-113(2)(a), however, adds non-trebled actual damages to the list of remedies precluded in class actions.[9]

Moreover, <u>Kreger v. Gen. Steel Corp.</u>, another case cited by plaintiffs, merely says that "[t]he CCPA prohibits the recovery of treble damages in class actions, and the Colorado courts are restrictive in their allowance of punitive damages under the CCPA."  No. 07cv575 (HGB), 2010 WL 2902773, at *14 (E.D. La. July 19, 2010) (citation omitted).  The case does not discuss the availability <u>vel non</u> of actual damages in class actions.

---

[9] The only case plaintiffs cite that postdates <u>Martinez</u> is <u>Spera v. Samsung Electronics Am., Inc.</u>, No. 12cv5412 (WJM), 2014 WL 1334256 (D.N.J. Apr. 2, 2014), which indicates that it was not issued for publication.  In any event, <u>Spera</u> does not address whether the CCPA permits actual damages claims in class actions; instead, citing <u>Robinson</u>, the case merely states that "treble damages are not available in a class action under the CCPA." <u>Id.</u> at *4.

16

In re OnStar Contract Litig., is the only case cited by plaintiffs that actually "concludes that the [CCPA] does not preclude class actions for actual damages."  600 F. Supp. 2d 861, 874 (E.D. Mich. 2009).  The court offered two justifications for this conclusion, neither of which is persuasive.  First, OnStar said that by the plain terms of the statute the Colorado legislature did not preclude class actions for monetary damages; "[r]ather, by its plain terms, it simply restricted its provisions for statutory damages [and] treble damages."  Id.  But, as quoted above, the statute explicitly excepts class actions from the private actions in which one is entitled to "the amount of actual damages sustained; or [statutory damages]; or [treble damages]."  Colo. Rev. Stat. § 6-1-113(2)(a) (emphasis added).  With the first disjunct, the Colorado legislature did indeed preclude actual damages claims in class actions.

Second, OnStar relied on Robinson.  600 F. Supp. 2d at 874.  But OnStar did not note that Robinson analyzed a version of the CCPA that did not expressly prohibit actual damages in class actions, as does the version that prevailed both when OnStar was decided and today.[10]  With non-certification of the contract,

_____

[10] All but conceding that the CCPA does in fact prohibit actual damages claims in class actions, plaintiffs, citing Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393

unjust enrichment, and CCPA claims, the Colorado subclass may not be certified.

IV.  <u>California Subclass</u>

It remains to be analyzed whether the California subclass can be certified.  The California subclass would assert both FAL and UCL claims.  Foster would be the class representative.

Plaintiffs assert that AS violated California law by fraudulently holding itself out -- principally through the three postings on its websites described above -- as a publisher capable of and invested in helping authors sell their books, when its business was actually designed to make money for AS instead of selling authors' books.  Plaintiffs assert that class members would not have purchased AS services but for its website descriptions of its marketing programs and identify the following question as common to all class members:  Did AS engage in a fraudulent scheme to sell worthless marketing services?  Plaintiffs seek a refund of all payments for marketing services made by each class member to AS.[11]

---

(2010), argue that "the CCPA's limitation on damages does not apply in federal class actions pursuant to FRCP 23."  But <u>Shady Grove</u> explicitly does not apply here.  <u>See</u> <u>id.</u> at 401 ("We need not decide whether a state law that limits the remedies available in an existing class action would conflict with Rule 23.").

[11] In other words, plaintiffs have settled on what is essentially an omissions theory, asserting liability in AS's failure to

A.    Legal Standards Under Rule 23

A party seeking certification of a class must "affirmatively demonstrate" compliance with each of the requirements of Rule 23, In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 117 (2d Cir. 2013) (citation omitted), cert. denied sub nom., US Foods, Inc. v. Catholic Healthcare W., 134 S. Ct. 1938 (2014), and the Court must undertake "a rigorous analysis" to satisfy itself that those requirements have been met, Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (citation omitted).  Thus, plaintiffs may sue as representatives of a class only if

    (1) the class is so numerous that joinder of all members is impracticable;

    (2) there are questions of law or fact common to the class;

    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If the above Rule 23(a) criteria are satisfied, an action

---

share that its business model is not tied directly to authors' book sales.  This action has been a story of plaintiffs' search for a theory of class-wide liability; their inability to find a winner despite numerous iterations only bolsters the ruling of non-certifiability.

may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b). Fed. R. Civ. P. 23(b); U.S. Foodservice, 729 F.3d at 117. Plaintiffs seek to certify a class under Rule 23(b)(3).[12]  Rule 23(b)(3) permits certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3); Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 137 (2d Cir. 2015).  Among other factors, courts are to consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b); U.S. Foodservice, 729 F.3d at 130 n.15.

---

[12] According to the SAC, plaintiffs brought this class action pursuant to both subsection (b)(2) and (b)(3) of Rule 23, but the instant motion seeks certification under subsection (b)(3) only.

20

"To certify a class, a district court must make a
definitive assessment of Rule 23 requirements, notwithstanding
their overlap with merits issues, must resolve material factual
disputes relevant to each Rule 23 requirement, and must find
that each requirement is established by at least a preponderance
of the evidence." Id. at 117 (citation omitted).  In other
words, "[t]he district judge must receive enough evidence, by
affidavits, documents, or testimony, to be satisfied that each
Rule 23 requirement has been met." Brown v. Kelly, 609 F.3d
467, 480 (2d Cir. 2010) (citation omitted).

    B.   Elements of UCL and FAL Claims

The Rule 23 analysis described above requires an
understanding of the elements of the claims that would be
certified in the California subclass.  "California's Unfair
Competition Law (UCL) bans 'unlawful, unfair or fraudulent
business act[s] or practice[s] and unfair, deceptive, untrue or
misleading advertising.'" Berger v. Home Depot USA, Inc., 741
F.3d 1061, 1068 (9th Cir. 2014) (quoting Cal. Bus. & Prof. Code
§ 17200).  "Each prong of the UCL [-- unlawful, unfair or
fraudulent --] is a separate and distinct theory of
liability . . . ." Kearns v. Ford Motor Co., 567 F.3d 1120,
1127 (9th Cir. 2009).

Unlawful acts are anything that can properly be called
a business practice and that at the same time is

21

> forbidden by law be it civil, criminal, federal,
> state, or municipal, statutory, regulatory, or court-
> made, where court-made law is, for example a violation
> of a prior court order. . . .  [F]raudulent acts are
> ones where members of the public are likely to be
> deceived.

Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1151-52

(9th Cir. 2008) (citation omitted).

> The FAL provides in relevant part:

> It is unlawful for any person, . . .
> corporation . . . , or any employee thereof with
> intent directly or indirectly to dispose of real or
> personal property or to perform services . . . or to
> induce the public to enter into any obligation
> relating thereto, to make or disseminate . . . before
> the public in this state, . . . in any newspaper or
> other publication . . . or in any other manner or
> means whatever, including over the Internet, any
> statement, concerning that real or personal property
> or those services . . . which is untrue or misleading,
> and which is known, or which by the exercise of
> reasonable care should be known, to be untrue or
> misleading . . . .

Cal. Bus. & Prof. Code § 17500.  "Whether an advertisement is

'misleading' must be judged by the effect it would have on a

reasonable consumer.  A reasonable consumer is the ordinary

consumer acting reasonably under the circumstances.  To prevail

under this standard, [plaintiffs] must show that members of the

public are likely to be deceived by the advertisement."  Davis

v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1161-62 (9th Cir. 2012)

(citation omitted).  "[A]ny violation of the [FAL] necessarily

violates the UCL."  Kasky v. Nike, Inc., 45 P.3d 243, 250 (Cal.

2002), as modified (May 22, 2002) (citation omitted).

    As the Ninth Circuit has explained:

> Unlike common-law fraud claims that focus on the
> victim's reliance or damages, the UCL focuses on the
> perpetrator's behavior: to state a claim under either
> the UCL or the [FAL] it is necessary only to show that
> members of the public are likely to be deceived.
> Actual falsehood, the perpetrator's knowledge of
> falsity, and perhaps most importantly, the victim's
> reliance on the false statements -- each of which are
> elements of common-law fraud claims -- are not
> required to show a violation of California's UCL.

Berger, 741 F.3d at 1068 (citation omitted) (emphasis added).

    C.   Application of Rule 23

    Even assuming that all of the Rule 23(a) requirements are

satisfied and that Rule 23(b)'s superiority condition is met,

the California subclass cannot be certified, because

predominance is lacking under Rule 23(b).  Predominance is

established where "the legal or factual questions that qualify

each class member's case as a genuine controversy can be

achieved through generalized proof and . . . these particular

issues are more substantial than the issues subject only to

individualized proof."  Johnson, 780 F.3d at 139 (citation

omitted).  "Rule 23(b)(3) requires that common questions

predominate, not that the action include only common questions."

Brown, 609 F.3d at 484.  "As long as a sufficient constellation

of common issues binds class members together, variations in the

sources and application of a defense will not automatically

23

foreclose class certification under Rule 23(b)(3)."  Id. at 483.
The essential inquiry for predominance is whether the proposed
class is "sufficiently cohesive to warrant adjudication by
representation."  Amgen Inc. v. Conn. Ret. Plans & Trust Funds,
133 S. Ct. 1184, 1196 (2013) (citation omitted).

     Here, the question whether AS's representations are likely
to deceive a reasonable consumer is not subject to generalized
proof.  Following the above-reproduced passage from Berger, the
Ninth Circuit went on to say that

> the question of likely deception does not
> automatically translate into a class-wide question.
> We do not, of course, suggest that predominance would
> be shown in every California UCL case.  For example,
> it might well be that there was no cohesion among the
> members because they were exposed to quite disparate
> information from various representatives of the
> defendant.  In two recent cases, [the Ninth Circuit]
> ha[s] held that class certification of UCL claims is
> available only to those class members who were
> actually exposed to the business practices at
> issue. . . .  [One of the cases concluded that] it was
> unreasonable to presume that all class members were
> exposed to [defendant]'s misleading statements, and
> that without such exposure, consumers were not likely
> to be deceived.

Berger, 741 F.3d at 1068 (citation omitted).

     Plaintiffs offer no evidence that members of the California
subclass, other than Foster, were exposed to the representations
about which they complain.  As such, class-wide exposure cannot
be presumed.  See id. at 1069 (no presumption of exposure where
independent analysis required to determine whether disclosures

24

in class members' contracts sufficed to alert customers to alleged omission). Indeed, class members may have read different parts of iUniverse's website (if they read it at all), and what they read may have been supplemented by any number and manner of telephone or email conversations with AS personnel. Whether particular AS representations would be likely to deceive any given class member, in other words, is not susceptible to generalized proof.

A lack of evidence of exposure is not the only reason that predominance is lacking here. Even where there might be evidence of exposure, the subject of that exposure is nebulous at best: The representations about which plaintiffs complain (the most damning of which are quoted above) are by any measure soft. AS's statements about its marketing services straddle the line between representation and puffery, making it all the more difficult to conclude that generalized proof could demonstrate that these statements would likely deceive a member of the public.

The interactions between AS and authors came through a combination of internet information, conversations (often by telephone) with salespeople, and written agreements. Plaintiffs allege no misrepresentations in the contract terms themselves, and, due to the lack of a sales calls script, do not base their

theory of class-wide liability on individual conversations either; plaintiffs are left with only the website representations. Those representations, however, hardly drive the conclusion that a uniform scheme to defraud victimized the class. It would be easier to find predominance if, say, plaintiffs offered evidence that everyone with an iUniverse Bookstore Premier Pro publishing package was victim to misrepresentations in the contracts they all shared.

It is unsurprising, however, that plaintiffs do not take this tack. Tellingly, the relevant contracts are nearly silent on the issue of marketing services. Under her contract, Foster granted AS the right to market her work, but notably absent is any accompanying obligation by AS to do so. Similarly, the portion of the agreement devoted to Rising Star sets out the eligibility requirements that Foster had to meet, but imposes no specific marketing duties on AS.

Against the conclusion that predominance is lacking, plaintiffs rely on In re Tobacco II Cases, where the California Supreme Court stated that "relief under the UCL is available without individualized proof of deception, reliance and injury." 207 P.3d 20, 35 (Cal. 2009). There, the class plaintiffs brought a UCL claim alleging that the tobacco companies concealed the relationship between their product and various

26

diseases by engaging in a public disinformation strategy,
beginning in the 1960s with magazine articles that questioned
the link between smoking and lung cancer, and persisting through
misrepresentations that the tobacco companies were dedicated to
the pursuit and dissemination of the scientific truth regarding
smoking and health.  Id. at 27.  In other words, plaintiffs
alleged a specific, definite, fraudulent scheme and pointed to
particular acts of artifice.  As the Ninth Circuit explained in
Berger -- and in Mazza v. Am. Honda Motor Co., 666 F.3d 581, 595
(9th Cir. 2012), which Berger discusses -- Tobacco II was a case
where exposure could be presumed, because it arose "in the
context of a decades-long tobacco advertising campaign where
there was little doubt that almost every class member had been
exposed to defendants' misleading statements, and defendants
were not just denying the truth but representing the opposite."
Mazza, 666 F.3d at 596 (citation omitted).

     The instant case, by contrast, does not provide the same
"extensive and longterm fraudulent advertising campaign."
Berger, 741 F.3d at 1068 (citation omitted).  Far from the
detailed scheme to misdirect alleged by the Tobacco II class
plaintiffs, the allegedly fraudulent scheme pressed by
plaintiffs here is nebulous.  Plus, unlike the parties in
Tobacco II, here, the relationships between plaintiffs and AS

27

are governed by contract; if plaintiffs were to have been uniformly deceived with respect to the services they purchased from AS, one would expect the contract setting forth the terms of that purchase to play some role.

Plaintiffs also contend that AS uses its website as a "script" during conversations with customers and prospective customers, thus increasing the chances that class members were uniformly exposed to the relevant representations. Plaintiffs' only support for this contention, however, is vague deposition testimony from the Senior Vice President of Marketing at AS. At one point, the deponent testified that certain marketing services would first be posted on the website and then, "[d]epending on the imprint, depending on the event, we also might do a promotional e-mail from the marketing department." And later, he explained that when a salesperson is discussing a marketing service with a customer or potential customer, "[f]or some services, there are what we would call template e-mails that they are supposed to use. But in most cases, they are supposed to point people to the website." On its face, this testimony does not substantiate plaintiffs' claim that website representations about iUniverse's marketing services were repeated to a large number of class members as a "script." Plaintiffs cannot show the uniformity necessary to make out

predominance here.

Aware of this substantial obstacle to class-wide relief, plaintiffs pivot and contend that their claims are not actually premised on each class member's reliance on a particular misrepresentation.  Indeed, they contend that a class may be certified because every class member was subject to a common deceptive scheme.  Plaintiffs rely on In re First Alliance Mortgage Co., where the Ninth Circuit reasoned:

> That [defendant]'s fraudulent system . . . did not consist of a specifically-worded false statement repeated to each and every borrower of the plaintiff class . . . does not make [defendant] immune to class-wide accountability.  The class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims.

471 F.3d 977, 992 (9th Cir. 2006).  In First Alliance, however,

> [t]he evidence . . . support[ed] the finding . . . that there was, in fact, a centrally-orchestrated scheme to mislead borrowers through a standardized protocol the sales agents were carefully trained to perform. . . .  The record shows, for instance, that loan officers were trained to misrepresent the monthly payment on the loan to make it appear lower than the borrower's prior mortgage payment, and when asked about points, to falsely state that "all fees and costs have already been computed into your monthly payment," and then to immediately redirect the borrower's attention to another document.

Id. at 991-92.  In other words, although a script was not required, some evidence of a centrally-orchestrated scheme with concrete misrepresentations was.  Despite the completion of

29

discovery, no such evidence has been presented here.

AS raises several other substantial defects in plaintiffs'
application for certification of a class.  Because those
discussed above are fatal to plaintiffs' application, it is
unnecessary to discuss the remaining arguments addressed in the
parties' briefs.

CONCLUSION

Plaintiffs' February 13 motion for class certification is
denied.

SO ORDERED:

Dated:    New York, New York
          July 1, 2015

                                    _____
                                              DENISE COTE
                                    United States District Judge